ACME LAUNDRY COMPANY, INC., & another[1] *vs.*
SECRETARY OF ENVIRONMENTAL AFFAIRS & another.[2]

Barnstable. December 5, 1990. - August 6, 1991.

Present: LIACOS, C J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Massachusetts Oil and Hazardous Material Release Prevention Act. Statute,* Construction. *Hazardous Materials.*

A responsible party's announced intention to undertake cleanup of certain
land, which had been contaminated by a release of fuel oil, did not
preclude the Commonwealth from recovering from that party under the
Massachusetts Oil and Hazardous Material Release Prevention Act,
G. L. c. 21E, the amount of the Commonwealth's investigative costs, as
well as its costs of planning, monitoring, and supervising the ongoing
cleanup operation, and the Department of Environmental Quality Engi-
neering acted properly, pursuant to G. L. c. 21E, § 13, in recording
notice of a lien on all real property of the responsible party. [764-773]
O'CONNOR, J., with whom NOLAN & LYNCH, JJ., joined, dissenting.

CIVIL ACTION commenced in the Superior Court Depart-
ment on January 24, 1989.

The case was heard by *Elizabeth J. Dolan,* J., on a motion
for summary judgment.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Robert S. Sanoff* (*Kathleen Chojinowski* with him) for the
plaintiffs.

*Frederick D. Augenstern,* Assistant Attorney General, for
the defendants.

---

[1]Acme Laundry Company, a partnership.

[2]Commissioner of the Department of Environmental Quality
Engineering, now the Department of Environmental Protection. See St.
1989, c. 240, § 101.

ABRAMS J. Acme Laundry Company and Acme Laundry
Company, Inc., filed suit alleging that the Department of En-
vironmental Quality Engineering (DEQE)[3] acted wrongfully
by placing a lien on their property pursuant to the Massa-
chusetts Oil and Hazardous Material Release Prevention
Act. G. L. c. 21E, § 13 (1990 ed.). Both sides moved for
summary judgment. The judge allowed the defendants' mo-
tion for summary judgment, and the plaintiffs appealed. We
transferred the case on our own motion. We affirm.

We set forth the facts as presented in the record and the
inferences that could be drawn therefrom as evidenced in the
materials before the judge. See *White* v. *University of Mass.
at Boston, ante* 553, 557 (1991). Acme Laundry Company,
Inc. (Acme I), was organized in 1916 by the Eldredge fam-
ily. Acme I acquired a parcel of land in Chatham, and oper-
ated a laundry business at that site from 1916 to 1985. In
February, 1986, Acme I contracted to sell the property
where it had conducted the laundry business. In December,
1986, Acme I adopted a plan of liquidation and dissolution.
At that time, Acme I conveyed twelve parcels of land, in-
cluding the site of the Chatham laundry business, to Acme
Laundry Company (Acme II), a partnership. Acme II suc-
ceeded to the rights of Acme I in the contract for sale. In
December, 1986, Kenneth Eldredge was the president of
Acme I and Leo Eldredge was the treasurer. The Eldredges
also were general partners of Acme II.

The prospective purchasers of the laundry site engaged an
environmental engineering firm to examine the site. As part
of that examination, two No. 6 fuel oil storage tanks were
removed from underground. One tank had a hole in it, and
the surrounding soil was discovered to be saturated with No.
6 fuel oil. The chief of the Chatham fire department notified
the DEQE of the contamination. Harold Bolster, a DEQE
employee, inspected the site in January, 1987. He spoke to
Kenneth Eldredge, who stated that Acme II would clean up
the contaminated site. In February, 1987, the DEQE sent

---

[3]Now the Department of Environmental Protection.

Acme II a notice of responsibility confirming Kenneth El-
dredge's acceptance of responsibility, on behalf of Acme II,
for the release of oil. The letter notified Acme II that DEQE
had reason to believe that Acme II was a responsible party
with liability under G. L. c. 21E, § 5 (*a*) (1), that this liabil-
ity might include up to triple the cost of "all response costs
incurred by the Department, including all contract, adminis-
trative, and personnel costs" and "all damages for injury, de-
struction, or loss of natural resources due to the release."
Tracking the language of the statute, the DEQE warned
Acme II that any such liability constitutes a debt to the
Commonwealth and creates a lien on all Acme II's property.
The letter noted that Kenneth Eldredge had informed the
DEQE that Acme II intended to take the necessary response
actions and had hired Goldberg Zoino Associates (GZA) to
determine the extent of the contamination and necessary re-
medial action. The letter advised Acme II that a site assess-
ment and recommendations for remedial action, along with
all data generated by the assessment, must be submitted for
review and approval by the DEQE.

The report prepared by GZA indicates significant oil con-
tamination on the site. The thickest part of soil saturation
extends more than twenty feet below the water table, and oil
floating on the groundwater and dissolved in it extends be-
yond the area of oil-saturated soil. The groundwater flows
toward Ryders Cove, fifty feet from the site, and Frost Fish
Creek, two hundred feet from the site. Ryders Cove and
Frost Fish Creek have been designated as areas of critical
environmental concern by the Executive Office of Environ-
mental Affairs.

In April, 1987, Acme Laundry Company, Inc. (Acme III),
was incorporated. Leo Eldredge is the president, Kenneth El-
dredge is the treasurer, and both are directors of Acme III.
Acme III is not engaged in the laundry business.

Affidavits from two DEQE employees responsible for su-
pervising the assessment and remedial activities at the site
detail the Commonwealth's involvement in these activities in
the months following the discovery of the release. In Janu-

ary, 1987, Harold Bolster conducted a series of conferences, by telephone and in person, with Harold Eldredge, GZA, and representatives of the Chatham fire department and the "Chatham shellfish section." He spent most of one day overseeing the excavation of contaminated soil from the site because Acme II had not hired an environmental consultant to oversee the excavation. In February and March, Bolster conducted other conferences with engineers from GZA concerning technical aspects of the site assessment which GZA was performing. In July, 1987, James Begley, another DEQE employee, assumed responsibility for oversight of the cleanup site. He conferred with GZA concerning DEQE's requirements for the site assessment. In August, Begley spoke with Kenneth Eldredge and requested a copy of the GZA report. Eldredge refused to send the report. Begley then prepared a letter explaining that Eldredge was obliged by law to submit the site assessment to the DEQE. Subsequently, Begley held a conference with Eldredge's attorney concerning the submission of the GZA report. Begley also visited the site to measure the distance from the spill to the nearest bodies of surface water.

On October 22, 1987, Acme II divided the property containing the contaminated soil into four parcels. One parcel includes all of the contaminated soil; the other three are free of contamination. Acme II conveyed the contaminated lot to Acme III. The only business of Acme III is holding property.

On October 23, 1987, Begley received the GZA report, and then spent two days reviewing it. In November, Begley held a further conference concerning the site cleanup. He reviewed five reports submitted by Groundwater Technologies, Inc. (GTI), the new environmental consulting firm employed by Acme II.

In November, 1987, the DEQE recorded a Statement of Claim and Notice of Lien, pursuant to G. L. c. 21E, § 13, against the property owned by Acme III. The property described included all four parcels of land. In November, 1988, the DEQE filed a discharge of the earlier lien and substi-

tuted two Statements of Claim, placing a lien on all properties owned by Acme II and Acme III in Barnstable county.

On January 24, 1989, Acme II and Acme III filed this action requesting a declaration that the lien is invalid and that the three parcels of property unaffected by the release cannot in the future be subjected to a c. 21E lien. The complaint also requested an injunction requiring the DEQE to discharge the current lien and preventing the DEQE from imposing a future lien under c. 21E on the three parcels of uncontaminated land. A second amended complaint was filed in June, 1989, which added requests for damages and for a declaration that Acme II is not a liable party under G. L. c. 21E.

The plaintiffs state that the gravamen of their claim is that the DEQE could not place a lien on their property pursuant to the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, "because the DEQE has incurred no costs for the 'assessment, containment, and removal' " of hazardous materials. Therefore, we look to the statute to determine how the Legislature defined "assessment" costs and when such costs can be the basis for a lien.

Chapter 21E "is drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous material." *Sheehy* v. *Lipton Indus.*, 24 Mass. App. Ct. 188, 192 (1987). The statute provides that the costs of cleanup are to be borne by those who are responsible for the release because they own or owned the land or because they caused the spill. G. L. c. 21E, § 5 (1990 ed.). The Legislature provided the DEQE with a number of different means of prodding a responsible party into undertaking cleanup actions, of ensuring that such actions are both timely and appropriate, and of recovering costs from the responsible party.[4] The lien provision

---

[4]The statute also authorizes the department to order a responsible party to conduct assessment, containment, and removal actions. G. L. c. 21E, § 9 (1990 ed.). A violation of the statute, an order, or a regulation, is presumed to constitute irreparable harm to the public health, safety, welfare, or the environment. A violator is subject to civil penalty, a fine, or imprisonment. G. L. c. 21E, § 11 (1990 ed.). A responsible party may be liable

used by the DEQE in this case is one of the tools provided by the statute to aid the Commonwealth in ensuring that cleanup is prompt and efficient. Section 13 provides that "[a]ny liability to the commonwealth under this chapter shall constitute a debt to the commonwealth. Any such debt . . . shall constitute a lien on all property owned by persons liable under this chapter when a statement of claim naming such persons is recorded or filed." G. L. c. 21E, § 13 (1990 ed.). To determine which persons are liable under the chapter and the extent of liability, we refer to § 5. Section 5 imposes liability without fault for releases of hazardous materials on various parties, including persons who currently own a contaminated site, or did own such a site at the time hazardous material was stored or disposed of at the site, and "any person who otherwise caused or is legally responsible for a release" of oil or hazardous material. This liability is imposed "(i) to the commonwealth for all costs of assessment, containment and removal incurred pursuant to [§§ 4 and 8] relative to such release . . . [and] (ii) to the commonwealth for all damages for injury to and for destruction or loss of natural resources, including the costs of assessing and evaluating such injury, destruction or loss, incurred or suffered as a result of such release. . . ." G. L. c. 21E, § 5 (a) (1990 ed.).

We therefore must examine §§ 4 and 8 to determine what "costs of assessment, containment, and removal" create liability. Section 4 authorizes the department "to take or arrange for such response actions as it reasonably deems necessary." G. L. c. 21E, § 4 (1990 ed.). Section 8 authorizes the department to enter any site in order to "undertake such actions relative to the assessment, containment, and removal" of releases. The section specifies that the department may enter a site to "investigate, sample, and inspect" records, conditions, or property. G. L. c. 21E, § 8 (1990 ed.). The "response actions" authorized by § 4 and "assessment" au-

---

to the Commonwealth for up to three times the costs incurred by the Commonwealth for response costs. G. L. c. 21E, § 5.

thorized under § 8 are defined in the act. "Response action" means "assess, assessment, contain, containment, remove, and removal." G. L. c. 21E, § 2 (1990 ed.). "Assessment" means "such investigations, monitoring, surveys, testing, and other information gathering activities to identify: (1) the existence, source, nature, and extent of a release . . . ; (2) the extent of danger . . . ; and (3) those persons liable . . . . The term shall also include, without limitation, studies, services and investigations to plan, manage and direct assessment, containment, and removal actions, to determine and recover the costs thereof, and to otherwise accomplish the purpose of this chapter." G. L. c. 21E, § 2 (1990 ed.). In sum, c. 21E provides that liability under § 5 (*a*) (i), and thus a debt to the Commonwealth under § 13, is created where the Commonwealth engages in "investigations, monitoring . . . and other information gathering activities . . . [including], without limitation, studies, services, and investigations to plan, manage, and direct assessment . . . actions . . . ." If the DEQE incurs costs for any of those activities, then it has the authority and discretion to place a lien on all property of a responsible person by filing or recording a statement of claim. A statement of claim is defined by the statute as an instrument "declaring a lien upon the property . . . for the payment of amounts due or to become due from such person . . . to the Commonwealth under this chapter." G. L. c. 21E, § 2 (1990 ed.). Thus, once the Commonwealth has incurred assessment costs, it may place a lien securing both the costs already incurred and those costs which will be incurred and become due in the course of ongoing monitoring and supervision.

The DEQE submitted two affidavits detailing the activities performed by two of its employees. These activities included visits to the site to oversee excavation and to investigate the site's proximity to surface waters, and conferences with the responsible party and with the environmental consultants to plan, direct, and review the technical studies of the site and proposals for remedial work. The affidavits submitted by the DEQE quantify the costs incurred by the Commonwealth

when the DEQE employees performed these activities and indicate that the department will continue to incur costs for monitoring and supervision.[5] The costs incurred by the Commonwealth for these activities fall squarely within the statutory definition of "assessment" costs. The judge therefore was correct in concluding that, "as a matter of law . . . the costs the Commonwealth incurred are collectible, thus creating a liability against the plaintiffs and for which a lien may be imposed on their property." Because the Commonwealth will continue to incur costs, the lien also may secure those costs which will become due in the future.

The plaintiffs maintain that the Commonwealth cannot be considered to have incurred "assessment" costs because Kenneth Eldredge, acting on behalf of Acme II, agreed to accept responsibility for the release and to perform necessary cleanup operations. The plaintiffs argue that c. 21E should be interpreted as providing that no liability to the Commonwealth can accrue if a responsible party agrees to perform the cleanup. The words of the statute are to the contrary.[6]

---

[5]Because the Commonwealth came forward with evidence of the costs it incurred, we need not address the question whether liability to the Commonwealth arises if the Commonwealth has not incurred any costs.

[6]We note that, although it is clear that Kenneth Eldredge accepted responsibility for the release on behalf of Acme II and expressed an intention to perform cleanup operations, more recently Acme II seemingly has sought to place in question its status as a responsible party. In the second amended complaint, Acme II requested that the court declare that Acme II "is not a party liable under c. 21E." The plaintiffs argue that "[i]n no event can a [c.] 21E lien be secured to property not contaminated when its owner is distinct from that of the contaminated parcel." Acme II has rid itself of the contaminated property by transferring it to Acme III. Thus, in addition to arguing that the liens are unjustified because the DEQE has not incurred "response costs," the plaintiffs are making a separate argument that once Acme II disposed of the contaminated parcel of land, no property of Acme II ever could be subject to a lien under c. 21E. Acme I was dissolved. Acme III now holds the contaminated parcel. However, we cannot determine from the record whether Acme III ever has accepted responsibility for the spill or has indicated its commitment to performing cleanup operations. Thus, of the three Acme Laundry Companies, the first is now dissolved, and the second accepted responsibility for the release but now seeks to avoid the Commonwealth's statutory means of enforcing that responsibility. The third entity, which now holds the land, may not have

The dissent states that a "response action" cannot be construed to include preliminary investigation activities because various provisions of the statute describe "preliminary assessment" actions which are to be taken in order to determine whether "response actions" are necessary. See G. L. c. 21E, §§ 3A (*d*) (1), 8. The Legislature, however, specifically addressed the issue raised by the dissent. The Legislature provided a definition in § 2 which specifically and explicitly includes both preliminary assessment activities ("investigations . . . to identify: (1) the existence . . . of a release . . . ; (2) the extent of danger . . . ; and (3) those persons liable") and ongoing monitoring of assessment activities ("without limitation . . . services and investigations to plan, manage, and direct assessment, containment, and removal actions") in the scope of "assessment." The Legislature thus plainly stated that investigations to determine whether a release has taken place as well as services to "plan, manage, and direct assessment" are themselves "assessment." It is, of course, appropriate to question whether under c. 21E "preliminary" assessment activities are to be considered as "assessment" activities and therefore as "response actions." However, the Legislature definitively has answered that question: the term "assessment" "shall include, without limitation, studies, services, and investigations to plan, manage, and direct assessment, containment, and removal actions . . . ." G. L. c. 21E, § 2 (1990 ed.). If there has been no release, then there can be no responsible party, and therefore no person who is liable under § 5. Thus, if the Commonwealth conducts preliminary assessment and discovers no release has occurred, then it cannot recoup the preliminary assessment costs. However, to interpret "response costs" as excluding preliminary

accepted responsibility and conducts no business except to hold land. In these circumstances, the DEQE is entitled to view with skepticism the plaintiffs' professed intention to perform prompt and efficient cleanup operations.

assessment[7] and monitoring costs would be to negate the words of the statute.

The plaintiffs refer to § 9 of c. 21E, which authorizes the DEQE to order a responsible party to conduct assessment, containment, and removal operations. The plaintiffs imply that, if the DEQE allows a responsible party to begin cleanup operations, then the DEQE is acting pursuant to § 9. They further imply that thereafter the Commonwealth cannot recover any costs it incurs for investigation, planning, monitoring, and supervision of the responsible party's activities. This theory is gainsaid by the statute. Section 9 specifically provides that "[i]ssuance of an order under this section shall not preclude, and shall not be deemed an election to forego, any action authorized by [§ 4] or any action to recover . . . costs . . . ." G. L. c. 21E, § 9 (1990 ed.). Section 4 authorizes the DEQE to incur costs for investigations, monitoring, and other information gathering activities, and planning, management, and direction of assessment, containment, and removal actions. Section 9 specifically preserves the DEQE's authority to act pursuant to § 4. Therefore, the suggestion that action under § 9 precludes the Commonwealth from incurring and recovering investigation and assessment costs conflicts directly with the statute. Nowhere in the statute is there the slightest intimation that a responsible party's announced intention to undertake cleanup precludes the Commonwealth from undertaking, and recovering for, investigative, monitoring, planning, and supervision costs.

The plaintiffs suggest that we look beyond the statute to Federal law for guidance in interpreting c. 21E. They note the relationship between c. 21E and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 et seq., which is in many ways analogous to the Massachusetts statute. They point in particular to a provision of CERCLA which authorized the Environmental Protection Agency (EPA) to take re-

---

[7]The costs which the Commonwealth seeks to recoup in this case were incurred after the fact of the release had been established.

sponse actions "*unless* the [EPA] determines that such removal and remedial action will be properly done by the owner." (Emphasis added.) 42 U.S.C. § 9604 (a) (1) (1983 ed.) (amended 1986). The applicable Federal regulation repeated this explicit limitation on EPA action when the EPA is convinced that the owner will clean up properly. 40 Code Fed. Regs. § 300.61 (1989 ed.). The plaintiffs urge us to infer from the Federal provisions that the Massachusetts Legislature intended a similar result when it drafted c. 21E, and ask us to import the Federal limitation on agency action into Massachusetts law. The use of such an inference of legislative intent to interpret c. 21E in this case is inappropriate for three reasons. First, the Legislature provided definitions of the essential terms as used in the chapter, so that the meaning of the provisions has been set forth by the Legislature. Because the language of the statute is the principal source of insight into the legislative intent, *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies and Bonds*, 382 Mass. 580, 582 (1981), we decline to alter the meaning of the State statute by reference to a "legislative intent" derived from a Federal statute. Particularly where the Federal provision is significantly different from the State provision, see *infra*, reference to a Federal statute in an attempt to determine the intent of the Massachusetts Legislature would be both unnecessary and improper. *Massachusetts Community College Council MTA/NEA* v. *Labor Relations Comm'n.*, 402 Mass. 352, 354 (1988); *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). Second, the Massachusetts provision is significantly different from the Federal provision in that the Federal provision contained an extra phrase which was omitted from the Massachusetts provision. The DEQE is authorized "to take or arrange for such response actions as it reasonably deems necessary." G. L. c. 21E, § 4 (1990 ed.). Unlike § 9604 of CERCLA, section 4 contains no language limiting the authority of the agency to act. The Legislature chose to structure the DEQE's authorization to take response actions free from the limitation ex-

pressed in CERCLA.[8] "If the language of a statute differs in material respects from a previously enacted analogous Federal statute which the Legislature appears to have considered, a decision to reject the legal standards embodied or implicit in the language of the Federal statute may be inferred." *Globe Newspaper Co.* v. *Boston Retirement Bd.*, 388 Mass. 427, 432-433 (1983). *Fletcher* v. *Cape Cod Gas Co.*, 394 Mass. 595, 602 (1985). *Vasys* v. *Metropolitan Dist. Comm'n*, 387 Mass. 51, 54 (1982). Third, Congress has eliminated the limitation on EPA action which formerly existed. CERCLA currently authorizes the EPA to take any response measures which the EPA "deems necessary to protect the public health or welfare of the environment. When the [EPA] determines that such action will be done properly and promptly by the . . . responsible party, the [EPA] *may* allow such person to carry out the action . . ." (emphasis added). 42 U.S.C.A. § 9604 (a) (1), as amended, Pub. L. 99-499, tit. I, § 104 (a) (West Supp. 1991). The applicable Federal regulation also has been rescinded. See 40 C.F.R. § 300 (1990). Thus, Congress has found it preferable to eliminate

---

[8]The applicable regulation provides that the DEQE "may *refuse* to permit a PRP [potentially responsible person] . . . to perform a response action" unless the department is persuaded that all requirements of c. 21E and the regulations will be met, that there will be no delay which might cause or exacerbate a hazard to health, public welfare, or the environment, and that "the PRP . . . has a satisfactory record of compliance with statutes and requirements enforced by the [d]epartment" (emphasis added). 310 Code Mass. Regs. § 40.170 (4) (d) (1988). Unlike the Federal regulation, the State regulation allows the DEQE to *exclude* a potentially responsible person from the assessment and cleanup process unless the DEQE is persuaded that the person will meet all four requirements set out in the regulation. The fact that one of the requirements is a past record of compliance with DEQE regulations is one indication that mere assurances of a party's future good intentions are not enough to prevent the department from refusing to allow that party to perform response actions. The contrast between the State regulation and the Federal regulation emphasizes the difference between the State statute and the Federal statute before it was amended. See *infra.*

Furthermore, even in those situations where this regulation might prevent the DEQE from forbidding a responsible party from acting, there is nothing in the regulation which would prevent the DEQE from recovering, monitoring, and supervisory costs.

the limitation on agency action, with the result that § 9604 of CERCLA now resembles c. 21E, § 4, more closely. We decline to mold our interpretation of c. 21E on a Federal provision which was significantly different from the Massachusetts law at the outset, and which now has been eliminated from Federal law.

Finally,[9] the plaintiffs argue that the purposes of c. 21E are undercut when the DEQE places a lien on property of a responsible party who has expressed an intention to perform cleanup operations. They argue that the funds gained from selling the unaffected parcels of land could be used to help finance cleanup operations. While it is possible that funds generated by the sale of the uncontaminated lots might be used to finance a cleanup, there is no guarantee that the proceeds would be so used. If, in fact, the plaintiffs need to sell the uncontaminated parcels in order to finance the cleanup, the regulations allow them to provide alternative security in the form of a trust fund, standby trust fund, letter of credit, escrow deposit, or surety bond. 310 Code Mass. Regs. § 40.170 (2) and (3). The DEQE states that, before summary

---

[9]After oral argument, the plaintiffs brought to the attention of the court a recently decided Supreme Court case, *Connecticut* v. *Doehr*, 111 S.Ct. 2105 (1991). The plaintiffs argue that *Doehr* provides authority for the proposition that the lien provisions of G. L. c. 21E, § 13, infringe on their Federal due process rights. The plaintiffs failed to raise a due process argument below. The record therefore does not reflect any factual findings by the judge. Thus, we do not reach this issue. *M.H. Gordon & Son* v. *Alcoholic Beverages Control Comm'n*, 386 Mass. 64, 73 (1982). " 'Only when the impact of a statute upon particular individuals . . . and upon a set of definite facts . . . has been shown, can a court decide a constitutional question with confidence that relevant considerations have not been overlooked.' *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 246." *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 445 (1972). *Phillips* v. *Youth Dev. Program, Inc.*, 390 Mass. 652, 660 (1983).

We do note that *Doehr* reaffirms the "truism" set out in *Mathews* v. *Eldridge*, 424 U.S. 319, 334 (1976), that "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Doehr, supra* at 2112. The circumstances of the instant case are markedly different from those present in *Doehr*. Other differences may serve to further distinguish *Doehr* from the case at bar. Such differences could have been explored if the issue had been presented properly.

judgment entered, it offered to release the lien if the plaintiffs provided such alternative security, and the plaintiffs refused. The DEQE asserts that, had the plaintiffs agreed to provide alternative security at any time during the litigation, the DEQE would have released the lien. In these circumstances, we consider that the lien has functioned effectively to secure the Commonwealth's recovery of its costs without interfering with the plaintiffs' ability to finance cleanup operations.

The plaintiffs also argue that the lien provision functions as a disincentive for responsible parties to perform cleanup operations themselves. This argument is not convincing. We believe that the Commonwealth's ability to place a lien to secure recovery of costs incurred for planning, monitoring, and supervising ongoing cleanup operations provides a powerful incentive to a responsible party to conclude the cleanup process as quickly and efficiently as possible. If a responsible party's unsupported expression of willingness to clean up, in the face of transfer of properties, see note 6, *supra*, is enough to prevent the Commonwealth from employing the § 13 lien provision or recovering monitoring costs, then the party's incentive will be simply to delay, because delay would entail no extra costs and would postpone expenditures for cleanup. Such a result would not "compel prompt and efficient cleanup." See *Sheehy* v. *Lipton Indus.*, 24 Mass. App. Ct. 188, 197 (1987).

*Judgment affirmed.*


O'CONNOR, J. (dissenting, with whom Nolan and Lynch, JJ., join). The court decides that if the DEQE (hereinafter referred to as the department) incurs any investigative cost relative to a release of oil or hazardous material, the department may place a lien on all of the responsible person's contaminated and uncontaminated property. The lien, says the court, is to secure the payment of any amount presently due or that may become due in the future. It appears, then, that

a single telephone call from a department employee to inquire about a possible release will enable the department to place a lien on all the real estate holdings, wherever situated, contaminated or uncontaminated, owned by the party ultimately found to be responsible for the release, and that that lien will remain in place until all assessment, containment, and removal have been completed. The result is that, in a case such as this one, where the property owner has accepted responsibility for assessment, containment, and removal, and the department has agreed to the owner's proceeding with that effort, the owner's real estate everywhere is rendered unmarketable and unavailable as a source of money to finance the desired remedial response, in many cases making successful response impossible.

Here, according to the affidavit of the department's employee, Begley, the remedial response will cost the plaintiffs $500,000 to $800,000, and more if treatment of "the water prior to ground water discharge," becomes necessary. The plaintiffs call the court's attention to the fact that the department's encumbering of all their real estate for the indefinite, and perhaps very distant, future deprives them of a means to pay for the remedial response that they have undertaken, and they persuasively argue that the Legislature could not reasonably have intended such a result. The plaintiffs' concern, and their argument, are met by the court with the response that "[i]f, in fact, the plaintiffs need to sell the uncontaminated parcels in order to finance the cleanup, the regulations allow them to provide alternative security in the form of a trust fund, stand-by trust fund, letter of credit, escrow deposit, or surety bond." *Ante* at 772. That is hardly an adequate response. Nothing in the record demonstrates the availability to the plaintiffs of the means to provide such "alternative security," particularly in light of their real estate having been encumbered by liens. Furthermore, in construing G. L. c. 21E, nothing can turn on the financial condition of the plaintiffs in this case. By making it difficult in some instances, and impossible in others, for those responsible for destructive releases into the environment to remedy those re-

leases at their own expense, and by otherwise discouraging such activity, as I shall discuss below, the court frustrates the obvious legislative intent that, whenever it is feasible, responsible parties alone, and not the Commonwealth's taxpayers, should lay out the very considerable sums required to respond adequately to hazardous releases. It is noteworthy, too, that, in accomplishing that unhappy result, the court necessarily ignores or nullifies language in the statute.

The court's opinion says that "[t]he plaintiffs state that the gravamen of their claim is that the DEQE could not place a lien on their property pursuant to the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, 'because the DEQE has incurred no costs for the "assessment, containment, and removal" ' of hazardous materials." *Ante* at 764. It is extremely important that the "gravamen" of the plaintiffs' argument be truly understood. Of course, in a broad sense, the department (DEQE) incurred costs with respect to the assessment, containment, and removal of hazardous materials. The plaintiffs do not contend otherwise. The plaintiffs do claim, however, that the department has not incurred costs for the kind of "assessment, containment, or removal" that constitutes "response action" within the statutory meaning of that term, and that a responsible party is not liable for department costs unless they were incurred in connection with "response action" undertaken by the department. The result, the plaintiffs say, is that the plaintiffs are not liable to the Commonwealth and therefore no liens are authorized by c. 21E, § 13. The issue raised by the plaintiffs is this: When a property owner accepts responsibility for the assessment, containment, and removal of oil and hazardous materials from his property, and, after preliminary investigation, the department agrees to the owner's proceeding with that "response action," as here, does G. L. c. 21E authorize the department to place a lien on the owner's real estate to secure the owner's payment of costs incurred by the department in connection with such preliminary investigation and monitoring of the owner's performance?

The plaintiffs' position, that c. 21E does not authorize a lien in such circumtances, is entirely correct. *Unless* the department's costs were incurred pursuant to § 4 or § 8 of c. 21E, that is, in connection with response action undertaken by the department, the plaintiffs are not liable for them and therefore no lien is authorized. *But,* the department's costs were not incurred pursuant to § 4 or § 8. *Therefore,* the plaintiffs are not liable for the costs incurred by the department and liens are not authorized.

An appreciation of whether the department's costs were incurred pursuant to § 4 or § 8 requires not only examination of those sections but also a clear understanding of the statutory meaning of the terms "response action" and "assessment." Section 2 defines "response action" as "assessment, containment, and removal." "Assessment" is defined as including "investigations, monitoring, surveys, testing, and other information gathering activities to identify: (1) the existence, source, nature and extent of a release of oil or hazardous materials; (2) the extent of danger to the public health, safety, welfare and the environment; and (3) those persons liable under section five." Pursuant to § 2, "assessment" "also include[s], without limitation, studies, services and investigations to plan, manage and direct assessment, containment and removal actions, to determine and recover the costs thereof, and to otherwise accomplish the purpose of [c. 21E]." The definitions are broad indeed. To conclude, however, as the court apparently does, that the term "response action" includes every kind of investigation, test, or study relative to a possible release of oil or other hazardous material, without consideration of how the term is used throughout c. 21E, is the height of simplism. It is obvious that the Legislature did not intend that all department preliminary investigations and the department's monitoring of a responsible party's response actions are themselves response actions, as the court concludes. The statute, read as a whole, clearly assumes that, once a response action has been undertaken by the responsible party, or by the department or its agent, then and only then "assessment" *by that party* is a

response action. Section 3A (*b*), for instance, makes clear that assessment for the purpose of identifying disposal sites must occur before response action status is determined and therefore cannot itself be a response action. Also, § 3A (*d*) (1) states in relevant part: "As quickly as possible and at most within one year of the listing of any location to be investigated the department shall complete a preliminary assessment of the location. A preliminary assessment shall include a review of available existing data and an offsite reconnaissance visit to the location to determine whether there is a need to further investigate the location to confirm if it is a disposal site." Surely, in determining legislative intent, one must go beyond a literal reading of § 2's definitions, and apply common sense to the statutory language as a whole. The Legislature could not have intended that the kind of investigation, study, or other "assessment" needed to determine whether response action is necessary is itself a response action. The Legislature could not reasonably have intended that the department should engage in response action to determine whether response action is necessary.

Sections 4, 8, and 9 deliver the same message; that is, that the department must engage in preliminary investigation and study in order to determine whether "response action" is called for and, if so, to identify the appropriate action and the party by whom it should be undertaken. For example, § 4 provides that "whenever [the department] has reason to believe" that there has been a release, the department may undertake response action, and under § 8 the department may investigate records, conditions, properties and the like and, on the basis of information gathered, take response action. The court ignores the obvious when it suggests that the preliminary investigations that took place in this case were "response actions" for the costs of which the plaintiffs are liable. The court also ignores the obvious when it concludes that investigation in various forms by the department in order to supervise or monitor the response action undertaken by the plaintiffs is "response action." Just as department investigations and studies done in order to determine whether re-

sponse actions are necessary cannot themselves be response actions, so, too, investigation and studies to determine whether response actions taken by a responsible party were satisfactory cannot themselves constitute response actions.

In relevant part, c. 21E, § 4, provides that "whenever [the department] has reason to believe that oil or hazardous material has been released . . . [*the department*] is authorized to take or arrange for such *response actions* as it reasonably deems necessary. Releases . . . *for which the department* undertakes *response actions*, and the extent of such *response actions*, shall be determined by reference to the Massachusetts contingency plan" (emphasis added). Section 8 provides in material part that, "[f]or the purpose of the administration and enforcement of [c. 21E] . . . the department may enter any site . . . to investigate, sample and inspect any records, conditions, equipment, practice or property," and that "[i]n the event that the department reasonably determines as a result of such investigation, sampling or inspection that there has been a release or that there is a threat of release of oil or hazardous material from or at such site . . . *the department* and its authorized personnel, agents and contractors *may enter such site . . . and undertake* such actions *pursuant to section four* relative to the assessment, containment and removal of oil or hazardous material as it reasonably deems necessary" (emphasis added).

In contrast to §§ 4 and 8, which provide for response action to be undertaken by the department when, on the basis of preliminary investigation, response action is indicated, § 9 provides for response action to be undertaken by the responsible party. The relevant portion of § 9 states: "Whenever it has reason to believe that oil or hazardous material has been released or that there is a threat of release of oil or hazardous material, the department may order any person causing or legally responsible for such release or threat of release to conduct an assessment of such release or threat of release," and may, if indicated, require such person to take containment and removal action. The final sentence in § 9 states that "[i]ssuance of an order under this section shall not pre-

clude, and shall not be deemed an election to forego, any action authorized by section four or any action to recover damages, costs, or to seek civil penalties, criminal fines and sanctions, or injunctive relief." Thus, the department's decision to order a responsible party to proceed with assessment, containment, and removal, or one or more of those activities, pursuant to § 9, does not operate as a waiver of the department's right at a later time to discard the § 9 alternative in favor of the alternative provided by § 4, namely assessment, containment, or removal conducted by, or arranged by, the department. However, the court's contrary suggestion notwithstanding, nothing in § 9 suggests that, while a § 9 order is in place, as it continues to be in this case, the department may incur costs for monitoring or supervising the response action undertaken by a responsible party with the department's approval and pass those costs along to that party.

Chapter 21E, § 5 (*a*), establishes a responsible party's liability for costs incurred by the department in specified circumstances. The relevant provisions are as follows: "Except as otherwise provided in this section, (1) the owner . . . of . . . a site from or at which there is or has been a release or threat of release of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . shall be liable, without regard to fault, . . . to the commonwealth for all costs of assessment, containment and removal incurred *pursuant to section four and section eight* relative to such release or threat of release . . ." (emphasis added). Section 5 (*a*) imposes liability only for the costs of response actions undertaken by the department "pursuant to section four and section eight." Here, no such costs were incurred, because no response action was undertaken by the department. In concluding that the plaintiffs are nonetheless liable for department costs, for which a lien may be imposed, the court simply reads out of § 5 (*a*) the words "pursuant to section four and section eight." By nullifying that

language, contrary to established precedent relative to statutory construction, see *Saccone* v. *State Ethics Comm'n*, 395 Mass. 326, 332 (1985), the court effectively, and, of course, inappropriately, amends the statute.

The notice of responsibility issued by the department to Acme II strongly suggests that, at least when that notice was given, the department construed c. 21E as I do. That language, which the court omits in its summary, was as follows: After asserting Eldredge's acceptance of responsibility on behalf of the partnership, the notice stated that its purpose was to inform Acme II that it is "a responsible party with liability under M. G. L. c. 21E, § 5 (a)," that the department was authorized *under § 4* to "take actions which it deems necessary to respond to the release *should you fail to carry through in your acceptance of responsibility*," that Acme Laundry Company's liability could be as much as three times the department's response costs and damages for injury to natural resources, and that, "*[i]f the Department does not hear from you within the times specified* [in the notice], *or if persons acting in your behalf fail to act within the prescribed times, the Department will commence response actions and expect to recover* from you to the extent of liability set forth above" (emphasis added). The department's understanding of the statute appears to have been that nothing it had done prior to the issuance of the notice of responsibility constituted "assessment" within the meaning of the term "response action," and, if the plaintiffs, rather than the department, were to undertake response action in compliance with the § 9 order, the plaintiffs would not be liable to the department and there would be no basis for the imposition of a lien. The department's original understanding was correct.

General Laws c. 21E, § 3 (*a*), provides that "[t]he department shall take all action appropriate to secure to the commonwealth the benefits of . . . CERCLA and other pertinent federal laws." Chapter 21E, § 2, defines "CERCLA" as "Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.*" Chapter 21E, § 3 (*b*), states that "[f]or the purpose of implement-

ing [c. 21E], . . . CERCLA, and other pertinent federal laws and regulations, the department is authorized and directed to prepare and from time to time update a Massachusetts Contingency Plan which, as nearly as the department deems appropriate and practicable, shall comport with and complement the National Contingency Plan prepared under the authority of 33 U.S.C. § 1321 (c) and 42 U.S.C. § 9605." Chapter 21E, § 3 (*c*), provides that "[t]he department shall promulgate such regulations as it deems necessary for the implementation, administration and enforcement of this chapter . . . , CERCLA and other pertinent laws." Clearly, then, in enacting G. L. c. 21E, the Legislature envisioned a State environmental protection program that would parallel the Federal plan codified in CERCLA. The Appeals Court has characterized CERCLA as "the Federal analogue of G. L. c. 21E." *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 198 (1987). Thus, CERCLA is a readily available source of help, one that the court rejects, in construing c. 21E.

At the time that c. 21E was enacted, CERCLA provided that "[w]henever (A) any hazardous substance is released . . . the Environmental Protection Agency (EPA) is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance . . . or containment at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the [EPA] deems necessary to protect public health or welfare or the environment, *unless* the [EPA] determines that such removal and remedial action will be done properly by the owner . . . of the . . . facility from which the release or threat of release emanates, or by any other responsible party" (emphasis added). CERCLA has been interpreted to "preclude[ ] response actions by the EPA if a responsible party will take proper removal and remedial action. See 42 U.S.C. § 9604 (a) (1) (A); and 40 C.F.R. § 300.61 (b)." *United States* v. *Dickerson*, 660 F. Supp. 227, 233 (M.D.

Ga. 1987). *Lone Pine Steering Comm.* v. *United States E.P.A.*, 600 F. Supp. 1487, 1490 (D.N.J. 1985) ("Section 104 (a) (1) of CERCLA . . . authorizes EPA to take curative action consistent with the [national contingency plan] *unless* [emphasis in original] [EPA] determines that such removal or remedial action will be done properly by the owner or operator . . . of the facility from which the release or threat of release emanates, or by any other responsible party"). The lesson taught by CERCLA and the Federal cases interpreting it is that public policy is best served by encouraging responsible parties, not the department, to undertake response action. In that way, government money is conserved and the number of sites that may be cleaned up is thereby maximized. *Lone Pine Steering Comm.* v. *United States E.P.A.*, *supra* at 1490. It is reasonable to suppose that the Legislature of the Commonwealth, as well as Congress, concluded that government money will go further in advancing environmental cleanup if private individuals are motivated to undertake at their own expense removal and remedial actions with respect to the release of oil or other hazardous material for which they are responsible. Otherwise, the Legislature would not have given the department the option under § 9 of ordering the responsible person to undertake response action instead of the department engaging in such action itself. In this regard, it is significant that the department's current regulation, 310 Code Mass. Regs. § 40.170 (4) (1988), guided by CERCLA as originally enacted,[1] provides as follows: "The Department may refuse to permit a PRP [potentially responsible person] or other person to perform a response action, or to assume responsibility for a response action being per-

---

[1]The court declines "to mold [its] interpretation of c. 21E on a Federal provision which was significantly different from the Massachusetts law at the outset, and which now has been eliminated from Federal law." *Ante* at 772. My response is twofold. (1) The relevant Federal provision was not significantly different from the Massachusetts law at the outset. (2) In construing G. L. c. 21E, the only relevant Federal provision that might suggest legislative intent is the provision that existed when c. 21E was enacted. It is immaterial that sometime after c. 21E was enacted, the Federal provision was amended.

formed by the Department, *unless* the Department is persuaded that:

> "(a) the deadlines set forth in 310 [Code Mass. Regs.]
> § 40.534 will be met;
> "(b) a delay in the conduct of the response action will
> not result which would cause or exacerbate an existing
> hazard to health, safety, public welfare or the
> environment;
> "(c) the response action will be conducted in accordance with M.G.L. c. 21E and this Contingency Plan;
> and
> "(d) the PRP or other person has a satisfactory record
> of compliance with statutes and requirements enforced
> by the Department" (emphasis added).

The court's construction of c. 21E as authorizing the imposition of a lien on all of the plaintiffs' real estate impairs, and perhaps destroys, the plaintiffs' — responsible parties' — capacity to complete the response action they agreed to undertake. In addition, the result reached by the court, a result not justified by the statutory language and at variance with the Federal cases construing CERCLA, removes the primary motive that a responsible party would otherwise have to undertake response action rather than leave it to the department, namely, cost control. Control would reside with the responsible party only if he could undertake the cleanup under § 9 and not simultaneously be liable for costs incurred by the department over which he would have no control. It is not to be expected that an informed owner of a contaminated site would agree to undertake a cleanup project at his expense when he will also be liable for open-ended duplicate "monitoring" costs incurred and passed on by department employees over whom he has no control. The history of this case, including its present posture, convincingly supports the conclusion that the court's holding will defeat the legislative objective in enacting c. 21E, which is to encourage responsible parties to clean up their own mess. Therefore, and also be-

cause the court's holding is unfaithful to the statutory language, I dissent. I would reverse the summary judgment for the defendants and I would remand this case to the Superior Court for the entry of a judgment declaring the asserted liens to be invalid and of no effect and ordering the defendants to file and record in the registry of deeds for Barnstable County a written release of all liens claimed.[2]

---

[2]In its footnote 6, the court states, "Thus, of the three Acme Laundry Companies, the first is now dissolved, and the second accepted responsibility for the release but now seeks to avoid the Commonwealth's statutory means of enforcing that responsibility. The third entity, which now holds the land, may not have accepted responsibility and conducts no business except to hold land. In these circumstances, the DEQE is entitled to view with skepticism the plaintiffs' professed intention to perform prompt and efficient cleanup operations." *Ante* at 767-768. Acme II, the partnership, did indeed accept responsibility for the release, and proceeded with appropriate response actions, but nothing before the court remotely suggests that Acme II "now seeks to avoid the Commonwealth's statutory means of enforcing that responsibility." Acme II and Acme III now seek only the removal of liens which were unlawfully imposed on their land and which impair their ability to complete their undertaking. If, as the court speculates, the department views with skepticism the plaintiffs' intention to keep their commitment, the statute makes available a variety of remedies, subject to administrative proceedings as provided in § 10, including damages, injunctive relief, the assessment of civil and criminal penalties, and the department's undertaking of the required response action. In so far as the record in this case discloses, the department has availed itself of none of these remedies, and has instead imposed unlawful liens, with the result that the goal of c. 21E has not been attained.