Commonwealth & others[1] *vs.* Boston Edison Company
& others.[2]

Suffolk. February 8, 2005. - May 25, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Massachusetts Oil and Hazardous Material Release Prevention Act. Hazardous Waste. Statute,* Construction. *Redevelopment Authority. Commonwealth,* Massachusetts Convention Center Authority, Liability for tort. *Damages,* Hazardous waste contamination. *Words,* "Owner or operator," "Otherwise caused," "Legally responsible."

In a civil action seeking to recover costs allegedly incurred as part of a cleanup that the plaintiffs undertook of a hazardous waste site previously owned by the defendants, the Commonwealth was not liable for the cleanup costs under G. L. c. 21E, § 5 (*a*) (5), as a person who otherwise caused or is legally responsible for a release of hazardous material due to the Commonwealth's alleged failure, for an extended period, to exercise its regulatory authority under G. L. c. 21E, the Massachusetts Hazardous Material Release Prevention Act, where the Commonwealth had no duty under the statute to take any given enforcement action with respect to the hazardous waste site. [332-336]

In a civil action seeking to recover costs allegedly incurred as part of a cleanup that the plaintiffs undertook of a hazardous waste site previously owned by the defendants, the Commonwealth, as one of the plaintiffs, was entitled to pursue joint and several liability against the defendants under the plain language of G. L. c. 21E, § 5 (*a*); moreover, the Commonwealth's express right to recover its costs jointly and severally extended to response costs incurred by agencies or offices of the Commonwealth beyond the Department of Environmental Protection, such as the Executive Office of Administration and Finance. [336-338]

In a civil action seeking to recover costs allegedly incurred as part of a cleanup that the plaintiffs undertook of a hazardous waste site previously owned by the defendants, the Boston Redevelopment Authority (BRA) and the Massachusetts Convention Center Authority (MCCA) were not liable as owners or operators of the site within the meaning of G. L. c. 21E, § 5 (*a*) (1) and (2), where the legislation giving rise to the BRA's and MCCA's association with the site explicitly excluded them from the defini-

[1]Boston Redevelopment Authority (BRA) and Massachusetts Convention Center Authority (MCCA).

[2]Sak Recycling Corporation, Walter Fiore and Fiore Construction Co., Inc. There are several third-party defendants in this case, but those third-party defendants are not parties to this appeal.

tion of "owner or operator" in G. L. c. 21E, § 2, for any pollution occurring before they acquired ownership of the site, consequently excluding them from liability under § 5 (a) (1) or (2) for any such pollution; where the language of that legislation, St. 1997, c. 152, § 3 (d), did not violate the "standing laws" provision of art. 10 of the Declaration of Rights of the Massachusetts Constitution; and where there was no basis in the record for holding the BRA and MCCA liable for contamination that may have occurred once they assumed ownership or operation of the site. [338-342]

In a civil action seeking to recover costs allegedly incurred as part of a cleanup that the plaintiffs undertook of a hazardous waste site previously owned by the defendants, the Boston Redevelopment Authority (BRA) and the Massachusetts Convention Center Authority (MCCA) were not liable as persons who otherwise caused or were legally responsible for a release of hazardous materials at the site within the meaning of G. L. c. 21E, § 5 (a) (5), where the fact that the BRA received a notice of responsibility from the Department of Environmental Protection prior to taking ownership of the site and undertaking cleanup activity at it was insufficient to confer liability under § 5 (a), and nothing in the record indicated that the BRA or MCCA, in remediating the site, at any time conducted any activities that caused the contamination. [342-343]

In a civil action seeking to recover costs allegedly incurred as part of a cleanup that the plaintiffs undertook of a hazardous waste site previously owned by the defendants, the plaintiffs Boston Redevelopment Authority and the Massachusetts Convention Center Authority were entitled to recover response costs, jointly and severally, from all liable defendants, where the first sentence of the third paragraph of G. L. c. 21E, § 4, when viewed in the context of the paragraph's remaining language, case law interpreting that language, and the statute's over-all purpose, permits a nonliable plaintiff to collect the entire amount of its response costs jointly and severally from any liable party. [343-346]

CIVIL ACTION commenced in the Superior Court Department on February 7, 1996.

The case was heard by *Nancy Staffier*, J., on motions for summary judgment, and questions of law were reported by her to the Appeals Court.

The Supreme Judicial Court granted an application for direct appellate review.

*Matthew Brock*, Assistant Attorney General, for the Commonwealth.

*George E. Olson* for Massachusetts Convention Center Authority.

*Roy P. Giarrusso* (*Joseph L. Harrington, III, & Curtis A. Connors* with him) for Boston Edison Company.

*Jack K. Merrill* for Sak Recycling Corporation.

*Leonard H. Freiman,* for Boston Redevelopment Authority, was present but did not argue.

COWIN, J. The plaintiffs in this case, the Commonwealth, the Boston Redevelopment Authority (BRA), and the Massachusetts Convention Center Authority (MCCA), seek to recover costs allegedly incurred as part of a cleanup they undertook of a hazardous waste site (site) that had previously been owned by the defendants Sak Recycling Corporation, Walter Fiore and Fiore Construction Company (collectively, the Sak defendants). Defendant Boston Edison Company (Boston Edison) had, over a period of many years, disposed of material at the site. The plaintiffs' claims arise under the Massachusetts Oil and Hazardous Material Release Prevention Act, G. L. c. 21E, for past and future reimbursement of costs associated with cleaning the polluted site (response costs). In particular, the Commonwealth seeks to recover funds expended by the Department of Environmental Protection (the department) and the Executive Office of Administration and Finance (A&F), while the BRA and MCCA independently seek reimbursement of their own costs (and do not assert recovery as agents of the Commonwealth). The plaintiffs also seek declaratory and injunctive relief under G. L. c. 21E, as well as common-law restitution.

The plaintiffs moved for summary judgment, and the trial judge denied the plaintiffs' motion insofar as it sought to hold the defendants jointly and severally liable for the alleged response costs. The basis for the judge's denial of joint and several liability was her conclusion that the Commonwealth, the BRA, and MCCA were all liable parties within the meaning of G. L. c. 21E, § 5 (*a*), and therefore the plaintiffs' claims all "sound[ed] in contribution" under G. L. c. 21E, § 4. The judge determined that the Commonwealth was a liable party, presumably under G. L. c. 21E, § 5 (*a*) (5) (as a party who "otherwise caused or is legally responsible" for the contamination), on the theory that it had waited too long to prosecute the case, and that the BRA and MCCA were likewise liable parties pursuant to § 5 (*a*) (1) (as present and future owners and operators of the

site).[3] The judge granted the plaintiffs' motions to report issues related to her summary judgment decision under Mass. R. Civ. P. 64, as amended, 423 Mass. 1410 (1996), and we granted the plaintiffs' applications for direct appellate review.

Our review of the judge's ruling presents us with the following questions of law concerning the meaning of, and relationship between, G. L. c. 21E, §§ 4 and 5 (a): (1) whether, on this record, the Commonwealth is a liable party under G. L. c. 21E, § 5 (a); (2) whether the Commonwealth is entitled to pursue joint and several liability for its claims against the defendants under G. L. c. 21E, §§ 4 or 5; (3) whether, on this record, the BRA and MCCA are liable parties under § 5 (a) of the statute; and (4) whether joint and several liability is available for the BRA's and MCCA's claims against the defendants under § 4. The Commonwealth argues that it is not liable under the statute and that G. L. c. 21E, § 5 (a), expressly establishes its right to pursue joint and several liability against all the defendants. Boston Edison contends instead that the Commonwealth is a liable party under G. L. c. 21E, § 5 (a) (5), for having "otherwise caused or [being] legally responsible" for contamination at the site due to its delay in taking enforcement action. The defendants also assert that the Commonwealth may only seek several liability[4] under G. L. c. 21E, § 4. With respect to the BRA and MCCA, the defendants argue that those plaintiffs are liable as "owners or operators" of the site under G. L. c. 21E, § 5 (a) (1) or (2), and as parties who "otherwise caused or [are] legally responsible for a release" under § (5) (a) (5). The BRA and MCCA counter that they are expressly exempt from liability as "owners or operators," and that, as nonliable parties, they are entitled to joint and several liability under G. L. c. 21E, § 4. We hold that neither the Commonwealth, the BRA, nor MCCA are liable parties as defined by G. L. c. 21E, § 5 (a),

---

[3]The judge further denied the Sak defendants' cross motion for summary judgment, as well as the plaintiffs' motion seeking injunctive relief.

[4]Where joint and several liability applies, plaintiffs may recover their full damages from any liable party. Parties "who pay more than their 'pro rata' . . . share of damages may then seek partial reimbursement, or contribution, from other [liable parties]." *Shantigar Found.* v. *Bear Mountain Bldrs.*, 441 Mass. 131, 141 (2004). By contrast, under several liability, liable parties would "pay according to their percentage of fault." *Id.*

and that each may pursue damages jointly and severally against any or all liable defendants under the statute.

*Statutory scheme.* We begin with a brief summary of the relevant statutory scheme. General Laws c. 21E, added by St. 1983, c. 7, § 5, establishes a comprehensive statutory scheme governing the cleanup of sites contaminated with hazardous material. See *Taygeta Corp.* v. *Varian Assocs., Inc.,* 436 Mass. 217, 223 (2002). The statute confers upon the department the primary authority for implementing its provisions. See generally G. L. c. 21E, §§ 3, 3A, 4. The Commonwealth may expend funds for environmental cleanup, see G. L. c. 21E, § 4, and then recover its costs and obtain injunctive and additional relief in a judicial enforcement action brought by the Attorney General. G. L. c. 21E, § 11.

Section 4 of the statute governs the department's authority to respond to the release or threat of release of hazardous material. It further allows other persons (beyond the department) to undertake proper response actions and entitles those persons to "reimbursement, contribution or equitable share" payments for their remediation costs. See G. L. c. 21E, § 4.

Section 5 (*a*) defines the five categories of persons liable under the statute for the costs of assessment, containment and removal of hazardous material "without regard to fault":

"(1) the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material; (3) any person who by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site or vessel from or at which there is or has been a release or threat of release of hazardous material; (4) any person who, directly, or indirectly, transported any hazardous material to transport, disposal, storage or treatment vessels or sites from or at which there is or has been a release or threat of release of such material; and (5) any

person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site."

G. L. c. 21E, § 5 (*a*). Such persons are liable "to the commonwealth for all costs" of such assessment, containment and removal, and with certain exceptions, "such liability shall be joint and several."[5] *Id.*

*Background.*

1. *Facts.* We summarize the undisputed material facts. From 1947 to 1992, Louis Freeman and his estate owned and operated the site as a junkyard known as Boston Junk. From the 1940's to the 1980's, Boston Edison contracted with Boston Junk to dispose of its transformers, cable, wire, and electrical equipment at the site. In 1984, the Department of Environmental Quality Engineering (DEQE)[6] filed a report with the Commonwealth detailing the presence of hazardous materials at the site. On December 1, 1987, the DEQE issued a notice of responsibility (NOR) to Boston Edison pursuant to G. L. c. 21E, stating that it had determined that a release of hazardous materials had occurred at the site, and that its information indicated that Boston Edison is a "liable and 'responsible' " party under G. L. c. 21E, § 5 (*a*). The NOR also set forth the requisite investigatory actions to be taken by Boston Edison concerning the site, and warned that if Boston Edison did not implement those investigatory actions, it would be liable to the Commonwealth for the costs of assessment, containment, and removal of the contamination, pursuant to an enforcement action under G. L. c. 21E, § 11. The Commonwealth alleges that,

---

[5]Those exceptions are "as provided in paragraphs (*b*) and (*k*)" of G. L. c. 21E, § 5. Paragraph (*b*) provides, in relevant part: "Any person otherwise liable for any costs or damages set forth in subclauses (i), (ii), (iii) and (iv) of paragraph (*a*) [of § 5] who establishes by a preponderance of the evidence that only a portion of such costs or damages is attributable to a release or threat of release . . . for which he is included as a party under clauses (1), (2), (3), (4) or (5) of said paragraph (*a*) shall be required to pay only for such portion." The exception to joint and several liability found in § 5 (*k*) involves the "liability of a municipality when sponsoring and conducting a household hazardous waste collection."

[6]The DEQE has since been renamed the Department of Environmental Protection (department). St. 1989, c. 240, § 101.

subsequent to the NOR, Boston Edison did not carry out the necessary and appropriate actions at the site.

In 1992, the estate of Louis Freeman sold the site to the Sak defendants. As part of their operations, the Sak defendants moved piles of scrap, including contaminated materials, from location to location on the site between 1992 and 1996. In 1997, the Legislature enacted St. 1997, c. 152, which authorized the development of the new Boston Convention Exhibition Center in the South Boston section of Boston (Convention Center legislation). This legislation grants the BRA the power to take property by eminent domain in order to effectuate the Convention Center legislation's purposes. *Id.* at § 3 (*a*). In 1999, pursuant to this statutory authority, the BRA acquired most of the site by eminent domain for the purpose of constructing the new Boston Convention Exhibition Center. The Convention Center legislation provides that the Commonwealth, through A&F, is responsible for funding a portion of the development with the BRA, including some costs of remediating contamination on the site. *Id.* at §§ 1A, 2, 6. Pursuant to a land disposition agreement between the BRA and MCCA, the BRA is primarily responsible for environmental response costs, with the MCCA engaging in and paying for certain response actions. The plaintiffs allege that the Commonwealth (through the department and A&F), the BRA, and MCCA have expended several million dollars in environmental cleanup costs at the site, and significant contamination remains to be remediated. In July, 2004, as established in the Convention Center legislation, the MCCA took title from the BRA to portions of the site in the Convention Center development area. See *id.* at § 3 (*a*).

2. *Procedural history.* The Commonwealth filed suit against Boston Edison and the Sak defendants on February 7, 1996, seeking recovery for its costs spent responding to the contamination at the site, and declaratory and injunctive relief.[7] On May 1, 1996, a preliminary injunction entered against the defendants enjoining them from all operations on the site except those in compliance with G. L. c. 21E. In 2001, the BRA and MCCA

---

[7]At approximately the same time, Boston Edison, the Sak defendants, and other interested parties filed suit to allocate the liability among themselves. This matter was consolidated with the Commonwealth's case.

were permitted to intervene as plaintiffs in the Commonwealth's suit in order to recover response costs that they had incurred.[8]

The plaintiffs moved for partial summary judgment in February, 2003, on the grounds that (1) the defendants are liable for past response costs under G. L. c. 21E, §§ 4 and 5; (2) the plaintiffs are entitled to injunctive relief ordering the defendants to perform any necessary and appropriate cleanup at the site under G. L. c. 21, § 11; (3) the plaintiffs are entitled to a declaratory judgment that the defendants are liable for future response costs; and (4) the defendants' liability to the plaintiffs is joint and several. Boston Edison opposed summary judgment, claiming in part that the Commonwealth, in waiting years before bringing an enforcement action, failed to prevent the Sak defendants from moving the contaminated piles. This movement, Boston Edison claims, exacerbated the release, thus rendering the Commonwealth liable under G. L. c. 21E. The Sak defendants filed a cross motion for summary judgment against the BRA and MCCA.

In March, 2004, the judge issued a memorandum of decision and order on the cross motions for summary judgment. With respect to the Sak defendants, the judge allowed the plaintiffs' motion, concluding that the Sak defendants were liable under G. L. c. 21E, § 5 (*a*) (1) and (2) (as an "owner or operator" and as an owner or operator "at the time of storage" of the hazardous material). The judge denied the plaintiffs' motion for summary judgment against Boston Edison because a factual dispute remained as to its liability under G. L. c. 21E, § 5 (*a*) (3) and (5) (as a person who "arranged for the transport,

---

[8]The plaintiffs' most recent amended complaint seeks reimbursement by the defendants for the Commonwealth's past and future response costs associated with the site (Count I); injunctive relief requiring the defendants to complete all necessary response actions at the site (Count II); recovery of up to three times the Commonwealth's response costs from Boston Edison (Count III); restitution from the defendants for all past and future response costs incurred by the Commonwealth (Count IV); reimbursement by the defendants for the BRA's and MCCA's past and future response costs associated with the site (Count V); recovery by the BRA and MCCA of costs incurred in enforcing G. L. c. 21E, including reasonable attorney's fees (Count VI); restitution from the defendants for all past and future response costs incurred by the BRA and MCCA (Count VII); and a declaratory judgment of the defendants' liability to the BRA and MCCA (Count VIII). The prayers for relief also seek a declaratory judgment of the defendant's liability to the Commonwealth.

disposal or storage of . . . hazardous material to or in a site" or as a person who "otherwise caused or is legally responsible for a release"). Relying on our decision in *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 309 (1997), and having found the Commonwealth, the BRA, and MCCA liable parties under G. L. c. 21E, § 5 (*a*), the judge also determined that the plaintiffs were only entitled to recover response costs severally in an action for contribution under G. L. c. 21E, § 4.

The Commonwealth, the BRA, and MCCA, as well as the Sak defendants, filed motions for reconsideration of the judge's denial of summary judgment and, in the alternative, requested that the judge report the propriety of her summary judgment rulings under Mass. R. Civ. P. 64. The judge granted the plaintiffs' motions to report five issues related to the summary judgment decision and stayed the proceedings pending the report.[9] As all five issues reported relate fundamentally to the correctness of the judge's rulings concerning the plaintiffs' liability under G. L. c. 21E, § 5 (*a*), and the plaintiffs' ability to pursue claims for joint and several liability against the defendants, we consider only those issues. See *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 261 n.4 (1993), quoting *Mc-Stowe* v. *Bornstein*, 377 Mass. 804, 805 n.2 (1979).

*Discussion.*

1. *Liability of the Commonwealth.* In construing G. L. c. 21E, we apply the general rule of statutory construction that a statute is to be interpreted "according to the intent of the Legislature ascertained from all its words . . . considered in connection with the cause of its enactment." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). As noted above, a party's liability under the statute is governed exclusively by the five categories set forth in G. L. c. 21E, § 5 (*a*). See *Martignetti* v. *Haigh-Farr, Inc., supra* at 298; *Griffith* v. *New England Tel. & Tel. Co.*, 420 Mass. 365, 366 (1995).

---

[9]Although not entirely clear from the record before us, the judge appears to have denied the Sak defendants' motion for reconsideration or report of her order of partial summary judgment. The judge also denied the plaintiffs' motion to reconsider or report the correctness of her denial of summary judgment on the issue of Boston Edison's liability. Consequently, we do not consider the propriety of the judge's rulings challenged in those motions.

Boston Edison argues that the Commonwealth's liability under G. L. c. 21E arises only under the "catch-all" provision of § 5 (*a*) (5), as a "person who otherwise caused or is legally responsible for a release" of hazardous material.[10] Boston Edison claims that the Commonwealth's failure to file suit or move to enjoin the Sak defendants' activities on the site between 1984 and 1996 "had the very real and dramatic impact of greatly exacerbating the condition of the contamination at the [s]ite." In essence, Boston Edison seeks to have us impose liability on the Commonwealth due to its alleged failure, for an extended period, to exercise its regulatory authority under the statute. The judge apparently agreed with this theory, holding the Commonwealth a liable party based on the "undisputed [fact] that the Commonwealth received notice of the presence of hazardous materials from [the department] in 1983." The judge's determination that the Commonwealth is a liable party under G. L. c. 21E, § 5 (*a*) (5), was erroneous. The Commonwealth had no duty under the statute to take any given enforcement action with respect to the site.

Chapter 21E does not mandate that the Commonwealth or its agents file suit against every potentially liable party. Rather, it confers discretion on the Commonwealth and its agents to file suit if and when appropriate in their judgment. See G. L. c. 21E, § 11 ("Upon request of the commissioner [of the department], the attorney general *may* bring an action to recover all costs incurred by the commonwealth . . ." [emphasis added]). Had the Legislature intended to mandate the filing of suit whenever the Commonwealth learns of contamination (an extraordinarily broad and burdensome requirement), it would have expressly stated such an intent. Instead, the Legislature made abundantly clear that the department, in enforcing the statute on behalf of the Commonwealth, has the authority to take a range of appropriate actions when it learns of contamination. Section 4 of the statute states: "The department, whenever it has reason to believe that oil or hazardous material has been released . . . is *authorized* to take or arrange for *such* response actions as it

---

[10]As the defendants do not contend that the Commonwealth is liable under the four remaining categories of § 5 (*a*), we do not consider liability under them.

*reasonably deems necessary*" (emphasis added). Similarly, the statute clarifies that the department's enforcement actions should prioritize high risk sites. See G. L. c. 21E, § 3A (*c*) (in identifying hazardous waste sites, department should place "particular emphasis on sites that pose a substantial hazard"); § 3A (*p*) ("The highest priority of the department under this chapter shall be to ensure response actions and temporary and permanent solutions at those sites which pose the greatest risk to public health, safety, welfare, and the environment"). Also significant, the proper exercise of enforcement discretion, such as that exercised by the Commonwealth here, is not ordinarily judicially reviewable. See, e.g., *Shepard* v. *Attorney Gen.*, 409 Mass. 398, 401 (1991), quoting *Ames* v. *Attorney Gen.*, 332 Mass. 246, 253 (1955). See also *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985).

Boston Edison's contention that the Commonwealth "otherwise caused or is legally responsible" for the release through its failure to act soon enough also ignores our case law construing the requirements for establishing liability under G. L. c. 21E, § 5 (*a*) (5). In *Marenghi* v. *Mobil Oil Corp.*, 420 Mass. 371 (1995), we held that "to impose liability under [the 'otherwise caused' prong of] § 5 (*a*) (5), a plaintiff first must establish both that the defendant caused the release and that the release caused the contamination." *Id.* at 374, citing *Griffith* v. *New England Tel. & Tel. Co.*, *supra* at 369. See also *John Beaudette, Inc.* v. *J.P. Noonan Transp., Inc.*, 419 Mass. 311, 314 (1995). This standard of causation is a higher standard of liability than that found under § 5 (*a*) (2)-(4), see *Marenghi* v. *Mobil Oil Corp.*, *supra*, and our cases suggest it requires more than a failure to prevent a release. In *Marenghi*, we concluded that the mere failure by the defendant to prevent an oil tank leak, without more, was insufficient to prove causation under § 5 (*a*) (5). *Id.* at 374. Similarly, in *Griffith* v. *New England Tel. & Tel. Co.*, *supra* at 369-370, we held that evidence that the defendant leased property on which tanks leaked oil was insufficient to prove causation under § 5 (*a*) (5), absent evidence of when and how the leak occurred. Here, any contamination to the site that may have occurred during the period in which the Commonwealth delayed filing suit, and thus may have been "exacerbated" by the Commonwealth's exercise of its enforcement discretion, is

simply too far removed from causation to be actionable under § 5 (a) (5).

Nor is the Commonwealth "legally responsible" for the release within the meaning of § 5 (a) (5). As discussed above, the Commonwealth had no duty under the statute to file suit in this case at all. A fortiori, it is not "legally responsible" by virtue of its choice to file suit at one time and not another, particularly where, as here, it has exercised its discretionary enforcement authority in a proper and timely manner under the statute. See *Marenghi* v. *Mobil Oil Corp.*, *supra* at 373-374 (no legal responsibility under § 5 [a] [5] where defendant had no contractual duty to prevent harm); *Griffith* v. *New England Tel. & Tel. Co.*, *supra* at 367-368 (no "legal responsibility" under § 5 [a] [5] absent duty to maintain leaky tanks under property lease or any evidence of failure to do so).

Our conclusion that § 5 (a) (5) is not applicable to the Commonwealth in this case is consistent with the over-all purpose of G. L. c. 21E, which is to force parties who are responsible for environmentally hazardous conditions, rather than the taxpayers, to bear the costs of cleanup. "Simply put, G. L. c. 21E was drafted . . . to ensure that costs and damages are borne by the appropriate responsible parties." *Taygeta Corp.* v. *Varian Assocs., Inc.*, 436 Mass. 217, 223 (2002). See *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 335 (1993) (one primary purpose of G. L. c. 21E is "to recover response costs from persons responsible for the contamination"); *Acme Laundry Co.* v. *Secretary of Envtl. Affairs*, 410 Mass. 760, 764 (1991) ("The statute provides that the costs of cleanup are to be borne by those who are responsible for the release . . ."). The Legislature's intent that polluters, rather than the Commonwealth, pay for the cleanup is reflected in the express exemption of the Commonwealth from the definition of "owner or operator." See G. L. c. 21E, § 2 (a) (excluding Commonwealth from definition of "owner or operator" potentially liable under c. 21E, "unless the commonwealth caused or contributed to the release or threat of release").

To determine in this case that the Commonwealth is a liable party that "otherwise caused" or is "legally responsible" for the release pursuant to § 5 (a) (5) would render the Com-

monwealth potentially liable for every decision to delay or decline filing suit, even where such decisions conform with the provisions and overall purpose of c. 21E. Moreover, it would in effect require the Commonwealth to file suit or take action *before* conducting the research necessary to determine whether and what action is best. Finally, it would impose an obligation on the Commonwealth that it has neither the resources nor the personnel to fulfil, requiring the Commonwealth to take immediate enforcement action against each of the thousands of parties polluting thousands of sites throughout the State.[11]

2. *Commonwealth's right to pursue joint and several liability.* The Commonwealth maintains its right to pursue joint and several liability against the defendants pursuant to G. L. c. 21E, § 5 (*a*). The defendants argue, however, that the Commonwealth is entitled only to several liability in an action under § 4. Boston Edison additionally contests the ability of the Commonwealth to recover A&F's (but not the department's) expenditures.

We begin with the plain language of the statute. See *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Auth.*, 392 Mass. 407, 415 (1984), citing *Bronstein* v. *Prudential Ins. Co.*, 390 Mass. 701, 704 (1984). The Commonwealth's right to pursue joint and several liability against all liable defendants is made explicit by the statutory language of G. L. c. 21E, § 5. Section 5 (*a*) provides that parties who are responsible for a release (i.e., liable under one of the five categories enumerated in § 5 [*a*] [1]-[5]) "shall be liable, without regard to fault . . . *to the commonwealth* for all costs of assessment, containment and removal incurred pursuant to [§§ 3A, 4, 5A, 5B, 8-14]. . . . Except as provided in paragraph (b) and (k), *such liability shall be joint and several*" (emphasis added). G. L. c. 21E, § 5 (*a*).[12] Section 5 (*e*) further emphasizes the imposition of joint and several liability on liable parties: "All persons liable pursuant to this section who are liable for a release or threat of release for which the commonwealth incurs

---

[11]In light of our conclusion, we do not address the reported issue of the Commonwealth's immunity from liability.

[12]The potential applicability of the defense to joint and several liability (set forth in § 5 [*b*]) is discussed below. The exception to joint and several liability found in § 5 (*k*) is not applicable here. See note 5, *supra.*

costs for assessment, containment, and removal shall be liable, *jointly and severally*, to the commonwealth for their liability as set forth in this section" (emphasis added). "The statutory language, when clear and unambiguous, must be given its ordinary meaning." *Bronstein* v. *Prudential Ins. Co., supra,* citing *Hashimi* v. *Kalil,* 388 Mass. 607, 610 (1983).

Without question, any reasonable and necessary response costs expended by the department fall squarely within the provisions of G. L. c. 21E, § 5 (*a*), and the Commonwealth can recover those costs by pursuing claims for joint and several liability against any of the defendants found liable under that section.[13] No party disputes that the department is a creature of the Commonwealth, or that G. L. c. 21E grants the department the primary authority to engage in the environmental enforcement and cleanup of the site expressly made recoverable under § 5 (*a*). See G. L. c. 21E, §§ 3A, 4, 5A, 5B, 8-10, 14.

The Commonwealth's express right to recover its costs jointly and severally pursuant to § 5 (*a*) also extends to response costs incurred by agencies or offices of the Commonwealth beyond the department, such as A&F. Like the department, A&F operates as a creature of the Commonwealth. See G. L. c. 7, § 2 (establishing A&F to "serve directly under the governor"). As noted above, § 5 (*a*) allows the Commonwealth, not merely the department, to recover response costs "incurred pursuant to [§§ 3A, 5, 5A, 5B, 8-14]." Many of these referenced sections expressly permit the Commonwealth to act through its agents, officers, contractors or personnel, see G. L. c. 21E, §§ 5A, 5B, 8, 12, and § 4 expressly allows parties such as A&F to conduct response actions. See G. L. c. 21E, § 4 (department "authorized to take *or arrange for* such response actions as it reasonably deems necessary" and "any person" may conduct "assessment, containment and removal" [emphasis added]). It is thus clear that the Legislature did not intend to limit the response costs recoverable by the Commonwealth under § 5 (*a*) to those incurred by the department. To the extent A&F incurred response costs pursuant to action taken under § 4 in coordina-

---

[13]The Sak defendants have already been found liable parties, see *supra*, and the plaintiffs will have the opportunity at trial to establish Boston Edison's liability under § 5 (*a*) (3) and (5).

tion with the department, the Commonwealth is able to recover those costs jointly and severally under § 5 (*a*) against all liable defendants.[14]

The defendants remain free to defend against joint and several liability only to the extent they can meet their burden under G. L. c. 21E, § 5 (*b*), to "establish[] by a preponderance of the evidence that only a portion of such costs or damages is attributable to a release" that renders them liable under § 5 (*a*) (1)-(5). Otherwise, to the extent that any defendant is held liable for more than its equitable share of the Commonwealth's response costs, it can pursue a claim for contribution against the other defendants under the third paragraph of G. L. c. 21E, § 4, which is applicable when two or more parties are found liable for response costs. See *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 308 (1997) ("The structure of G. L. c. 21E allows the Commonwealth to make one liable party entirely responsible for a cleanup, leaving the final allocation of costs among all the liable parties dependent on the outcome of a private action under § 4"). In fact, such a contribution action by the Sak defendants against Boston Edison is already pending. See note 7, *supra.*

3. *Liability of the BRA and MCCA.* Among the five potential means of establishing liability under G. L. c. 21E, § 5 (*a*), the defendants contend that the BRA and MCCA are liable under two theories: as "owners or operators" of the site, § 5 (*a*) (1) and (2); and as parties who "otherwise caused or [are] legally responsible" for the contamination, § 5 (*a*) (5). We first consider whether the BRA and MCCA are liable as "owners or operators" of the site, and then consider whether they are liable for having "otherwise caused or [being] legally responsible" for contamination at the site. We conclude that neither basis of liability applies to the BRA or MCCA in this case.

a. *"Owner or operator" liability.* As noted above, the BRA's and MCCA's association with the site is a result of the Conven-

---

[14]Boston Edison contests the Commonwealth's ability to recover A&F's expenditures, arguing they were not response costs, but rather construction-related activities not recoverable under G. L. c. 21E. The question of precisely what A&F expenses are recoverable as response costs under the statute presents a factual issue for resolution at trial.

tion Center legislation. See St. 1997, c. 152. Under the legisla-
tion, the BRA and MCCA are both explicitly excluded from the
definition of "owner or operator" in G. L. c. 21E, § 2, and
consequently excluded from liability as "owners or operators"
under § 5 (*a*) (1) or (2), for any pollution occurring before they
acquired ownership of the site. St. 1997, c. 152, § 3 (*d*).[15] The
exemption applies to the BRA and MCCA only provided that
the BRA has complied with the requirements of G. L. c. 21E,
§ 2 (*d*) (2) and (3). Section 2 (*d*) (2), in turn, would exempt the
BRA and MCCA from liability as an "owner or operator" only
if "[n]o act of [the BRA] causes or contributes to the release."

The Sak defendants do not explicitly assert that the BRA (or
the MCCA) caused or contributed to the release of hazardous
materials from the site within the meaning of § 2 (*d*) (2). They
do allege, however, in connection with a related argument, that
during the BRA and MCCA's control of the site, rain fell on the
site, and the BRA and MCCA moved piles of contaminated
debris. Neither falling rain nor any movement of contaminants
by the BRA and MCCA as part of their effort to remediate the
site can be said to have caused or contributed to the release
within the meaning of § 2 (*d*) (2). To find liability on that basis
would render the express exclusions of the Convention Center
legislation and G. L. c. 21E, § 2 (*d*) (2), void in virtually every
instance in which they could possibly apply. We will not
"interpret a statute in such a way as to make a nullity of its
provisions if a sensible construction is available." *Com-
monwealth* v. *Wallace*, 431 Mass. 705, 708 (2000), and cases
cited. Moreover, the defendants do not claim that the BRA and

---

[15]The relevant portion of St. 1997, c. 152, § 3 (*d*), states:

"The redevelopment authority [i.e., the BRA] and the Authority
[i.e., the MCCA] and the Massachusetts Port Authority shall be
excluded from the definition of an owner or operator of the project and
the convention center development area with respect to releases of
hazardous materials that occur before the redevelopment authority
acquires ownership of any portion of such site upon or from which
such a release may occur as if the redevelopment authority were a city
or town that has purchased or taken such land for the nonpayment of
taxes, in accordance with paragraph (*d*) of the definition of 'Owner' or
'Operator' of section 2 of chapter 21E of the General Laws; provided,
however, that the redevelopment authority complies with all the require-
ments set forth in subparagraphs (2) and (3) of said paragraph (*d*) . . . ."

MCCA failed to comply with the procedures set forth in G. L. c. 21E, § 2 (d) (3). Therefore, the BRA and MCCA qualify for the express exclusion from the definition of "owner or operator" provided for in the Convention Center legislation.

Boston Edison, on the other hand, concedes that the plain language of § 3 (d) of the Convention Center legislation would relieve the BRA and MCCA of liability as owners or operators of the site with respect to any releases occurring prior to the BRA's acquisition of the site, but maintains that this section of the legislation is unconstitutional. Boston Edison contends that the legislation "provid[es] the BRA and MCCA with special legal rights to which they would not otherwise be entitled" in violation of the "standing laws" provision of art. 10 of the Declaration of Rights of the Massachusetts Constitution.[16] Article 10 "denies legislative power to single out an individual [or group] for treatment which departs from that which is being accorded the public . . . under law." *Commissioner of Pub. Health* v. *Bessie M. Burke Memorial Hosp.*, 366 Mass. 734, 742 (1975). In determining whether the Convention Center legislation complies with the dictates of art. 10, "[t]he critical inquiry is whether the challenged statute [or provision] can be said to have *some* legitimate public purpose that predominates over the benefit it otherwise confers on [an entity] and over any injury to another party." *Kienzler* v. *Dalkon Shield Claimants Trust*, 426 Mass. 87, 90-91 (1997) (emphasis added). "[T]he Legislature may go so far as to confer an outright bounty on [an entity] 'if some public purpose is promoted, [that is] if the statute is "for the good and welfare" of the Commonwealth . . . as to which the Legislature's judgment will weigh heavily.' " *Id.* at 91, quoting *Boston* v. *Keene Corp.*, 406 Mass. 301, 307 (1989). "The party challenging the statute's constitutionality must demonstrate beyond a reasonable doubt that there are no 'conceivable grounds' which could support its validity." *Kien-*

---

[16]The first sentence of art. 10 of the Declaration of Rights of the Massachusetts Constitution reads: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws." We have interpreted the phrase "standing laws" to mean "enacted legislation of general application." *Kienzler* v. *Dalkon Shield Claimants Trust*, 426 Mass. 87, 89 n.1 (1997), citing *Commissioner of Pub. Health* v. *Bessie M. Burke Memorial Hosp.*, 366 Mass. 734, 742 (1975).

*zler* v. *Dalkon Shield Claimants Trust, supra* at 89, quoting *Boston* v. *Keene Corp., supra* at 305 (citations omitted). We also adhere to the well-settled rule that "a reviewing court must grant all rational presumptions in favor of the constitutionality of a legislative enactment." *Id.*

The legitimate public purposes of the Convention Center legislation are elucidated in § 1 of the legislation. They include "to attract and accommodate large national and international groups who wish to conduct conventions, exhibitions and other similar events within the commonwealth [which] is beneficial to the economic development of the commonwealth and the general welfare of its citizens" and to "promote the economic health of the commonwealth by encouraging private investment and development." St. 1997, c. 152, § 1. At the time the Legislature passed the Convention Center legislation authorizing the BRA and MCCA to acquire the site, we can presume it was well aware of the pollution at the site and the ongoing litigation concerning its cleanup. The legislation contemplated that the BRA and MCCA would undertake whatever response actions were necessary to clean the site. See St. 1997, c. 152, § 2 (defining site costs, in part, as "the cost of environmental investigation, analyses, and remediation"). In shielding the BRA and MCCA from liability as owners or operators, § 3 (*d*) was thus critical to the ultimate success of the Convention Center project, including its speedy completion. Even if § 3 (*d*) confers a benefit on the BRA and MCCA not available to others, Boston Edison has not met its burden of "demonstrat[ing] beyond a reasonable doubt that there are no 'conceivable grounds' which could support [§ 3 (*d*)'s] validity." *Kienzler* v. *Dalkon Shield Claimants Trust, supra,* quoting *Boston* v. *Keene Corp., supra* (citations omitted).

That the BRA and MCCA qualify for the exemption conferred by § 3 (*d*) of the Convention Center legislation, and that the provision is constitutional, does not end our inquiry regarding the BRA and MCCA's potential liability as "owners or operators" under G. L. c. 21E, § 5 (*a*) (1) or (2). Section 3 (*d*) of the Convention Center legislation excludes the BRA and MCCA from the definition of "owner or operator" only with respect to releases that occurred prior to their acquisition of the site. See

St. 1997, c. 152, § 3 (d). It says nothing of their liability for releases that may have occurred once they became owners or operators. However, there is no basis in the record for holding the BRA and MCCA liable as "owners or operators" for contamination that may have occurred once the BRA and MCCA assumed ownership or operation of the site. The MCCA did not undertake any cleanup related activities at the site until after the soil and debris piles had been removed, and the BRA promptly commenced the cleanup of soil and debris after having acquired the property in 1999. The BRA and MCCA have engaged in significant response actions to remediate pollution at the site, and the defendants have not referred us to any record evidence that indicates any releases occurred or were exacerbated once the BRA and MCCA assumed ownership or operation of the site.[17]

b. *"Otherwise caused" or "legally responsible" liability.* The remaining basis upon which the BRA and MCCA could potentially be deemed liable is pursuant to G. L. c. 21E, § 5 (a) (5) ("otherwise caused or is legally responsible").[18] Even if not liable as "owners or operators" of the site, the BRA and MCCA could be liable parties if they caused or were responsible for a release at the site. The Sak defendants argue that the BRA is a liable party because it "received a notice of responsibility from the [department] in or about 1999, then undertook clean-up activity at the [s]ite" and that the MCCA is liable "on the same grounds for any future clean-up activity" because it received title to the site from the BRA. Boston Edison similarly claims that the BRA is liable under § 5 (a) (5) for receiving an NOR and taking ownership of the site while knowing of the contamination, and MCCA is liable due to its "ownership interest" in the site and because it "acted as an operator of the [s]ite with full knowledge of contamination."

---

[17]The Sak defendants argue that the BRA and MCCA are liable under G. L. c. 21E, § 5 (a) (1) and (2), as "owners or operators" because they do not qualify for the exemption from the definition of "owner or operator" for redevelopment authorities set forth in G. L. c. 21E, § 2 (f) (2). We need not address this argument because we hold that the BRA and MCCA are excluded from the definition of "owner or operator" under the Convention Center legislation.

[18]The defendants do not suggest, nor is there any basis for finding, that the BRA or MCCA are liable under G. L. c. 21E, § 5 (a) (3)-(4).

In construing the "otherwise caused or [] legally responsible" provision of § 5 (*a*) (5), we have held that merely taking title to property is not sufficient to establish liability under that subsection. See *Griffith* v. *New England Tel. & Tel. Co.*, 420 Mass. 365, 369 (1995); *Marenghi* v. *Mobil Oil Corp.*, 416 Mass. 643, 647 (1993), *S.C.*, 420 Mass. 371 (1995). Simply receiving an NOR is similarly insufficient to confer liability under § 5 (*a*) (5). Although relied on by Boston Edison, our decision in *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294 (1997), does not suggest otherwise. In *Martignetti*, while we considered the existence of an NOR sent to the plaintiffs by DEQE as relevant to our determination that the plaintiffs' claim was one for contribution, the plaintiffs in that case conceded liability under § 5. See *id.* at 307, 309 n.28. Here, BRA and MCCA contest liability and the defendants have not pointed to any record evidence that the BRA or MCCA, in remediating the site, at any time conducted any activities that caused the contamination. The BRA and MCCA are therefore not liable parties within any of the five provisions of § 5 (*a*).

4. *Right of BRA and MCCA to pursue joint and several liability*. We now address whether the BRA and MCCA may recover response costs, jointly and severally, from all liable defendants. The Sak defendants argue that neither the BRA nor the MCCA is entitled to hold the defendants jointly and severally liable under G. L. c. 21E, § 4, while the BRA and MCCA contend that § 4 permits them, as nonliable parties, to recover through joint and several liability.

In resolving this issue, we consider the interaction between liability under G. L. c. 21E, § 5 (*a*), and the ability to recover response costs under G. L. c. 21E, § 4. The mechanism by which non-Commonwealth parties such as the BRA and MCCA may recover response costs is suit pursuant to G. L. c. 21E, § 4. The third paragraph of § 4 provides:

> "*Any person* who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material *shall be entitled* to *reimbursement* from *any other person liable* for such release or threat of release for the reasonable costs of such response action. *If two or more persons are liable* pursuant

to section five for such release or threat of release, each shall be liable *to the others* for their *equitable share* of the costs of such response action" (emphasis added).

G. L. c. 21E, § 4, as amended by St. 1994, c. 252, § 7. The second sentence, by its plain terms, governs actions between two or more *liable* parties. As the BRA and MCCA are not liable parties under G. L. c. 21E, § 5 (*a*), see part 3, *supra,* their claims are not subject to the "equitable share" liability of the second sentence of the third paragraph of § 4. Instead, their claims are for "reimbursement" of response costs under the first sentence of the paragraph, which applies to "[a]ny person who undertakes a . . . response action." G. L. c. 21E, § 4.

We must resolve whether nonliable parties suing for "reimbursement" under the first sentence of the third paragraph of § 4 can recover jointly and severally against liable defendants. Section 4 does not specify whether a nonliable plaintiff suing for reimbursement is able to impose joint and several liability. However, when viewed in the context of the paragraph's remaining language, our case law interpreting that language, and the statute's over-all purpose, the third paragraph of § 4 permits a nonliable plaintiff to collect the entire amount of its response costs jointly and severally.

The first sentence of the third paragraph provides for an "entitle[ment] to reimbursement." We have in the past defined the term "reimbursement" as employed in § 4 as "repaying or making good the amount paid out." *Oliveira* v. *Pereira,* 414 Mass. 66, 73 (1992), quoting *Boston* v. *Commonwealth,* 322 Mass. 177, 179 (1947). See Webster's Third New Int'l Dictionary 1914 (1993) ("reimburse" defined, in part, as "to pay back [an equivalent for something taken, lost, or expended]"). Where, as here, a party is not liable for any of the costs of cleanup, such reimbursement must be for the full amount of the response action(s). Cf. *Martignetti* v. *Haigh-Farr, Inc., supra* at 309 ("contribution" action by liable parties under § 4 is "sharing of response costs . . . among parties whose underlying liability . . . is imposed by the provisions of § 5"). The statute also provides that a party may recover from "any other person liable," as opposed to "any other person*s* liable." By its terms then, § 4 permits a nonliable plaintiff to sue *any*

liable party for full reimbursement of its response costs, thus implicating joint and several liability. Cf. *Shantigar Found.* v. *Bear Mountain Bldrs.*, 441 Mass. 131, 141 (2004) (under joint and several liability, "plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages"). Our reading of § 4 is consistent with the over-all structure of the statute, which elsewhere contemplates that nonliable parties, such as the Commonwealth, can fully recover costs jointly and severally from any one liable party, while "leaving the final allocation of costs among all the liable parties dependent on the outcome of a private [contribution] action under § 4." *Martignetti* v. *Haigh-Farr, Inc., supra* at 308. Our interpretation also comports with the purpose of the statute, which is to compel responsible parties, not nonliable parties including taxpayers, to bear the costs associated with environmental remediation. See discussion in part 1, *supra.* See also *Taygeta Corp.* v. *Varian Assocs., Inc.*, 436 Mass. 217, 223 (2002); *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 335 (1993); *Acme Laundry Co.* v. *Secretary of Envtl. Affairs*, 410 Mass. 760, 764 (1991).

Our holding today is consistent with our previous consideration of G. L. c. 21E, § 4, in the case of *Martignetti* v. *Haigh-Farr, Inc., supra.*[19] In *Martignetti*, which involved an action for response costs under § 4 brought by a liable party against other liable parties, see *id.* at 309 n.28, we held that "an action to require contribution among [liable parties] under § 4 imposes several liability only [as opposed to joint and several liability]." *Id.* at 315. Having concluded that actions brought by liable parties under § 4 should be treated as contribution actions, see *id.* at 309, the court then reasoned that it would be "illogic[al to] allow[] joint and several liability in an action for contribution." See *id.* at 315 n.37. Here, in contrast, we have an action for reimbursement by nonliable plaintiffs under the first sentence of the third paragraph of § 4, which entitles the plaintiffs to pursue

---

[19]At the time the action in *Martignetti* commenced, the text of G. L. c. 21E, § 4, was different from the current version at issue here. See *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 297-298 (1997); St. 1992, c. 133 (amending text of G. L. c. 21E, § 4). However, in *Martignetti*, we construed the older version of § 4 consistently with the 1992 amendments, see *id.* at 308-309, and thus this distinction does not render our analysis in *Martignetti* inapplicable to the present case.

full recovery against any and all liable parties. This is not an action for contribution, and joint and several liability is not inappropriate.[20]

Federal cases construing the comparable provisions of the Federal Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675 (2000), provide support for our reading of G. L. c. 21E, § 4. See *Martignetti* v. *Haigh-Farr, Inc., supra* at 301 n.12 ("To the extent that there are similarities in language and structure [between G. L. c. 21E and CERCLA], it is desirable to arrive at similar interpretations . . ."). Like c. 21E, CERCLA contains no explicit directive that nonliable plaintiffs are entitled to joint and several damages, but contains similar language implicating such liability. See 42 U.S.C. §§ 9607(*a*), 9613(*f*)(1).[21] Consistent with our interpretation of c. 21E today, Federal courts have found that nonliable parties may pursue their response costs through joint and several liability under § 9607(*a*) of CER-CLA, while liable parties are generally limited to actions for contribution under § 9613(*f*)(1).[22]

*Conclusion.* In summary, we determine that neither the Com-

---

[20]When a plaintiff seeking recovery of response costs under § 4 is a liable party under § 5 (*a*), the case of *Martignetti* v. *Haigh-Farr, Inc., supra*, will control, and such a plaintiff will not recover jointly and severally under § 4.

[21]Section 9607 (*a*) of CERCLA sets forth the bases for liability under the statute. 42 U.S.C. § 9607(*a*)(1)-(4). Then, similar to the first sentence of the third paragraph of G. L. c. 21E, § 4, CERCLA's § 9607(*a*) provides that "any person" liable within the meaning of the section "shall be liable for . . . any other necessary costs of response incurred by any other person." Like the second sentence of the third paragraph of G. L. c. 21E, § 4, CERCLA's § 9613(*f*)(1) governs claims for contribution among liable parties. It states: "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(*a*) of this title . . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

[22]See, e.g., *Western Prop. Serv. Corp.* v. *Shell Oil Co.*, 358 F.3d 678, 689, 692 (9th Cir. 2004); *Dico, Inc.* v. *Amoco Oil Co.*, 340 F.3d 525, 529-530 (8th Cir. 2003); *Morrison Enter.* v. *McShares, Inc.*, 302 F.3d 1127, 1132-1133 (10th Cir. 2002); *New Jersey Turnpike Auth.* v. *PPG Indus.*, 197 F.3d 96, 104 (3d Cir. 1999); *Axel Johnson, Inc.* v. *Carroll Carolina Oil Co.*, 191 F.3d 409, 415 (4th Cir. 1999); *Bedford Affiliates* v. *Sills*, 156 F.3d 416, 423-424 (2d Cir. 1998); *Centerior Serv. Co.* v. *Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348, 350-351 (6th Cir. 1998); *Rumpke of Indiana, Inc.* v. *Cummins Engine Co.*, 107 F.3d 1235, 1240, 1242 (7th Cir. 1997); *Redwing Carriers, Inc.* v. *Saraland Apartments*, 94 F.3d 1489, 1496-1497 (11th Cir. 1996); *United Techs.*

monwealth, the BRA, nor the MCCA is a liable party within the meaning of G. L. c. 21E, § 5 (*a*). All three plaintiffs may pursue claims for joint and several liability against all liable defendants. The order of the Superior Court judge denying the plaintiffs' motion for summary judgment as to the availability of joint and several liability against the defendants is vacated, and partial summary judgment shall enter in favor of the plaintiffs on this issue. The case is remanded to the Superior Court for further proceedings in accordance with this opinion.

*So ordered.*

---

*Corp.* v. *Browning-Ferris Indus.*, 33 F.3d 96, 100 (1st Cir. 1994), cert. denied, 513 U.S. 1183 (1995); *Amoco Oil Co.* v. *Borden, Inc.*, 889 F.2d 664, 672 (5th Cir. 1989).