NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-1638                                          Appeals Court


R.M. PACKER CO., INC. vs. MARMIK, LLC & others.[1]


No. 14-P-1638.

Dukes.      September 2, 2015. - November 25, 2015.

Present:  Meade, Wolohojian, & Milkey, JJ.


Massachusetts Oil and Hazardous Material Release Prevention Act.
    Hazardous Materials.  Damages, Hazardous waste
    contamination, Attorney's fees.  Contribution.  Practice,
    Civil, Attorney's fees, Costs, Findings by judge.
    Department of Environmental Protection.



Civil action commenced in the Superior Court Department on
May 8, 2009.

The case was heard by Gary A. Nickerson, J., and a motion
for attorney's fees and costs was heard by him.


John D. Curran for the plaintiff.
Marilyn H. Vukota for Vineyard Port Hole, Inc.



---

[1] Wallace Realty Trust; TP Panancy LLC; Vineyard Markets,
Inc.; and the Vineyard Port Hole, Inc.  Vineyard Port Hole, Inc.
is a closely held Massachusetts corporation, owned by Terrence
P. McCarthy, doing business as Dockside Marina (Dockside).

WOLOHOJIAN, J.  At issue is whether R.M. Packer Co. (Packer) was properly found liable for attorney's fees and costs under G. L. c. 21E, § 4A(f), after it unsuccessfully sought contribution from the defendants for costs to clean up an oil spill.  In three circumstances, the statute requires that reasonable attorney's fees and costs be awarded against a plaintiff who has sued seeking contribution for environmental clean-up costs.  Those three circumstances are

> "[i]f the court finds that (1) the plaintiff did not participate in negotiations or dispute resolution in good faith; (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiff's position with respect to the amount of the defendant's liability pursuant to the provisions of this chapter was unreasonable."

G. L. c. 21E, § 4A(f), inserted by St. 1992, c. 133, § 294. Here, after a bench trial, a judge found that Packer had no reasonable basis for asserting its claim against the defendant Dockside at the time it filed suit, and accordingly awarded fees and costs under § 4A(f)(2).  The judge reached this conclusion despite the fact that, before Packer filed its complaint, the Department of Environmental Protection (DEP) had issued a notice of responsibility to Dockside, stating that it had reason to believe that Dockside was a "[p]otentially [r]esponsible [p]erson."

Packer argues that DEP's position vis à vis Dockside's potential responsibility provided a reasonable basis upon which

Packer could sue Dockside for contribution.  Hence, Packer argues, the judge erred in awarding fees and costs under § 4A(f)(2).  We do not need to reach this issue because, on the facts found by the judge (and not challenged on appeal), the award was independently proper under § 4A(f)(3).  We accordingly affirm the award on that basis.

Background.[2]  Packer was in the business of selling and delivering petroleum-based products on Martha's Vineyard.[3]  Before the events at issue in this case, Packer had owned a piece of commercial property located at 27 Lake Avenue in Oak Bluffs, where a gas station was located.  In 1998, Packer

---

[2] The facts are drawn from the trial judge's clear and detailed written findings.  Where, as here, a judge acts as the trier of fact, his or her factual findings must be accepted on appeal unless shown to be clearly erroneous.  See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).  Packer does not argue that any of the judge's subsidiary findings are clearly erroneous.  Moreover, the findings are in essence unreviewable because the trial transcript was not included in the appellate record.  Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), & 18(a), as amended, 425 Mass. 1602 (1997).  See Kunen v. First Agric. Natl. Bank of Berkshire County, 6 Mass. App. Ct. 684, 689-691 (1978); Cameron v. Carelli, 39 Mass. App. Ct. 81, 83-84 (1995); Buddy's Inc. v. Saugus, 62 Mass. App. Ct. 256, 264 (2004).

[3] Ralph M. Packer, Jr. was the company's chief executive officer; Packer employees, Scott Bailey and Mark Leith, were deliverymen.

installed underground fuel[4] storage tanks behind the station. Tank one was for diesel fuel; tank two was for gasoline.

Two piers stretched into Oak Bluffs Harbor nearby. On one of those piers, Dockside owned and operated pumps that dispensed fuel to motor boats. Dockside's pumps were connected to tanks one and two, and Dockside purchased the fuel it needed for its operations from Packer, who delivered it to, and stored it in, those two tanks.

In 2000, as part of a larger business deal, Packer sold the property, including the tanks, to Marmik, LLC (Marmik), an unrelated firm. As a result, Marmik inherited Dockside as what the parties call a "pass-through" customer; after the transaction, Dockside continued to purchase fuel from Packer (paying Packer directly), and Packer continued to deliver it to tanks one and two. However, those tanks were now owned and maintained by Marmik,[5] and Dockside paid Marmik a per gallon handling charge for this arrangement.[6]

---

[4] When we refer to "fuel" in this opinion, we do so colloquially where it makes no difference whether the substance referred to is diesel fuel or gasoline.

[5] Dockside neither leased the tanks nor exercised (or assumed) exclusive or shared control of the tanks. Dockside was not responsible for maintenance or repairs to the tanks. Further, it had no duty to monitor the fitness of the tanks.

[6] Dockside also entered into an indemnification agreement with Marmik, agreeing to indemnify Marmik from "acts or

Marmik adapted the property to meet its business needs. Among other changes, it added a nine-foot fence enclosing the area where the tanks were buried. In this same area, Marmik had installed a concrete base with layers of sand on top, which was customized to serve as an outdoor seating area for a restaurant on an abutting parcel. These changes to the site made it difficult for Packer's deliverymen to use the pole method to check the fuel levels before filling the tanks. The pole method entails lowering a measuring pole through the direct fill cap of the tank to measure the level of the tank's contents. The pole method is a customary and reliable method of measuring the level of a tank's contents and allows the deliveryman to determine how much fuel can be added to the tank without risking a spill.

While Packer's deliverymen had on occasion used the pole method to measure the fuel levels, they usually relied instead on a remote electronic sensory system known as a veeder root system (VRS), which Packer had put in place when the tanks were added to the site. With the aid of sensors inside each tank, the VRS measured and recorded each tank's fuel capacity on a running tape (akin to a sales register printout); thus, the VRS recorded the volume of fuel in a tank and its ullage, i.e., the number of gallons that could be added. The VRS terminal was

---

omissions" of Dockside and its agents. This agreement, however, does not appear to be implicated here.

housed in a nearby convenience store and available when the store was open for business.

On the evening of Saturday, July 7, 2007, a Dockside employee measured the fuel in the tanks using the VRS, which recorded fifty-four inches of diesel fuel in tank one and eighteen inches of gasoline in tank two.  In turn, according to the parties' well-established protocol, the Dockside employee reported the readings to Packer, stating (in inches) the height of fuel in each tank.  In addition to reporting the fuel levels, the Dockside employee ordered gasoline (for tank two) to be delivered as early as possible the following morning.  Dockside did not order any diesel (for tank one).  On Sunday, at about 6:00 A.M., Skip Bailey, Packer's employee, accurately recorded Dockside's fuel levels (i.e., fifty-four inches of diesel and eighteen inches of gasoline) in a company ledger.

For reasons set out in more detail in the margin,[7] Packer was delayed in making the delivery and Dockside's owner, Terrence McCarthy, became correspondingly agitated that Dockside would run out of fuel.[8]  Ultimately, Leith made the delivery.

---

[7] Bailey intended to deliver gasoline to Dockside after a delivery via ferry to another customer located on Chappaquiddick Island.  That delivery was dependent on the tides, and Bailey was delayed on Chappaquiddick Island, due to unfavorable conditions that prevented the ferry from returning to Edgartown.

[8] McCarthy left two messages with an outside answering service for Packer, indicating that without a prompt delivery

However, rather than delivering gasoline, he delivered diesel fuel. Moreover, he did not check tank one's capacity, either by the pole method or by using the VRS terminal before filling the tank. Nor did he take any other reasonable step to ascertain the level of diesel fuel in tank one.[9] Instead, Leith attached the truck's hose to the remote (indirect) fill spout for tank one and proceeded to fill it. At the moment he began offloading diesel fuel, tank one had room for about 273 gallons. By the time Leith stopped force pumping diesel fuel, he had delivered 1,060 gallons of diesel, the tank had ruptured, the sensor rod within the tank had shot through the top of the tank "like a rocket," and diesel fuel was gushing from the tank "like a small geyser." The best estimate is that 787 gallons of diesel fuel spilled as a result.

In the aftermath of the spill, the DEP conducted an investigation that led it to send a notice to Dockside stating that it had reason to believe that Dockside was "a Potentially

---

Dockside would run out of fuel. Driving to the site, a Packer employee, Mark Leith, telephoned McCarthy, who voiced his urgent need for fuel. McCarthy did not refer to "diesel" fuel, either in his messages left with the answering service or in conversation with Leith. Nor did Leith inform McCarthy that diesel, not gasoline, would be delivered that day.

[9] Leith had delivered 2,000 gallons of diesel fuel the previous day which, the trial judge found, should have raised doubts in Leith's mind that additional diesel fuel was needed. He could have easily resolved any such doubt by walking over to the Dockside pumps.

Responsible Party (a 'PRP') with liability under . . . G. L. c. 21E, § 5, for response costs."  A like notice was sent by DEP to Packer, indicating that Packer was also a PRP liable under the Act for the spill.

Packer hired an environmental firm to remediate the spill and, all told, the clean-up costs came to $300,000, which were assumed by Packer's insurance company.  Packer then, pursuant to G. L. c. 21E, § 4A, sent demand letters to both Dockside and Marmik, demanding that they each contribute eighty percent of the remediation costs (which, had the defendants acceded to the demand, would have resulted in a significant windfall). Packer's demand at no point changed despite the fact that, as the trial judge found, "Packer well knew that Dockside was blameless in this instance."  The parties did not resolve their differences and Packer brought this suit against Dockside, among others,[10] asserting liability based on common-law (negligence) principles as well as certain provisions of G. L. c. 93A and G. L. c. 21E, the Massachusetts Oil and Hazardous Material Release Prevention Act (Act).  Dockside asserted a counterclaim for an award of its attorney's fees and costs under G. L. c. 21E, § 4A(f)(1)-(3).

---

[10] See note 1, supra; the other named defendants are not implicated in this appeal.

After an eight day bench trial, the judge issued findings of fact and found in favor of Dockside on all of Packer's claims. On Dockside's counterclaim, the judge awarded Dockside $66,409.50 in attorney's fees and costs, relying on G. L. c. 21, § 4A(f)(2),[11] and concluded: "[w]hen Packer filed its complaint, application of the facts to the existing law made it reasonably clear that Dockside was not liable under G. L. c. 21E." The only issue before us is the award of fees and costs.[12]

Discussion. General Laws c. 21E is a comprehensive statute designed to promote the prompt and efficient cleanup of sites contaminated by the release of hazardous materials and to provide a legal framework by which response costs are borne by, and appropriately allocated among, those responsible. See Commonwealth v. Boston Edison Co., 444 Mass. 324, 335 (2005); Bank v. Thermo Elemental Inc., 451 Mass. 638, 653 (2008). Under the Act, a person, as defined by § 2, is authorized to undertake

---

[11] Section 4A(f)(2) authorizes an award of litigation costs and reasonable attorney's fees to a defendant if a court concludes that "the plaintiff had no reasonable basis for asserting that defendant was liable." And, in connection with his ruling, the judge cited Scott v. NG US 1, Inc., 450 Mass. 760, 773 (2008) ("the question is whether, when the complaint was filed, application of the facts to existing law made it reasonably clear that the defendant[] [was] not liable under G. L. c. 21E").

[12] Although Packer's notice of appeal states that Packer appeals from the judgment, its only argument on appeal is in regards to the award of attorney's fees and costs to Dockside pursuant to G. L. c. 21E, § 4A(f)(2).

response actions[13] to remediate a contaminated site and is
entitled to reimbursement "from any other person liable" for the
release of hazardous materials.  G. L. c. 21E, § 4, third par.,
as appearing in St. 1992, c. 133, § 293.  If two or more persons
are liable, then each is liable to the others for their
equitable share.[14]  Ibid.  See Martignetti v. Haigh-Farr, Inc.,
425 Mass. 294, 308 (1997); Commonwealth v. Boston Edison Co.,
supra at 338.

Section 4A of the Act sets out a detailed prelitigation
process that a person must follow if that person wishes to
obtain contribution from others who may also have liability for
environmental clean-up costs.  To begin with, the person seeking
contribution must send a demand letter specifying (among other
things) the nature, scope, and cost of the remediation, the
legal and factual basis for the demand, and the amount of
contribution or reimbursement being sought.  G. L. c. 21E,
§ 4A(a).  The recipient of such a demand letter is required to

---

[13] "Response," as defined by § 2 of the Act, encompasses
assessment, containment, and removal measures to remediate a
site.  A response action is deemed complete when it achieves a
"permanent" solution, a result that is attained when a site no
longer poses a "significant risk" to the public or environment
for a "foreseeable period of time."  G. L. c. 21E, § 3A(g), as
appearing in St. 1992, c. 133, § 283.

[14] There is no question in this case that Packer is liable
as a "person who . . . caused or is legally responsible for a
release . . . of oil . . . from a . . . site."  G. L. c. 21E,
§ 5(a)(5), inserted by St. 1983, c. 7, § 5.

respond within forty-five days, and may request additional documentation. Ibid. Either party may request that the dispute be submitted to arbitration, mediation, or some other form of alternative dispute resolution. G. L. c. 21E, § 4A(b). Only after this procedure has been followed can suit be filed in Superior Court. G. L. c. 21E, § 4A(c). The purpose of this procedure is to prevent the parties from resorting to litigation unless and until they have attempted to resolve the allocation and burden of remediation among themselves.

As a further incentive to encourage the parties to take reasonable prelitigation positions and to resolve their disputes among themselves, the Legislature designed a fee-shifting structure that penalizes any party who takes unreasonable prelitigation positions regarding liability or cost sharing. A plaintiff is to be awarded its litigation costs and reasonable attorney's fees if the court finds that the defendant is liable and "(1) failed without reasonable basis to make a timely response to a [demand letter], or (2) did not participate in negotiations or dispute resolution in good faith, or (3) failed without reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the costs of such response action or of other liability pursuant to the provisions of this chapter, where its liability was

reasonably clear."[15]  G. L. c. 21E, § 4A(d).  On the other hand, "[i]f the court finds that (1) the plaintiff did not participate in negotiations or dispute resolution in good faith; (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiff's position with respect to the amount of the defendant's liability pursuant to the provisions of this chapter was unreasonable, it shall award litigation costs and reasonable attorneys' fees to the defendant."  G. L. c. 21E, § 4A(f).  In essence, attorney's fees and costs are to be awarded against any person who takes an unreasonable prelitigation position regarding the existence or extent of another person's liability.

Here, the judge awarded fees and costs, concluding that Packer had "no reasonable basis for asserting that [Dockside] was liable."  G. L. c. 21E, § 4A(f)(2).  This conclusion rested on the judge's subsidiary findings, including his finding that Dockside was wholly blameless for the spill in this case.  Indeed, the judge found that the spill was caused by Packer's employee, who mistakenly delivered diesel fuel to tank one without first measuring the level in the tank.  Dockside had not

---

[15] In the absence of one of these conditions, the plaintiff shall not receive attorney's fees and costs even if the court finds the defendant liable for contribution, reimbursement, or equitable contribution.  G. L. c. 21E, § 4A(e).

ordered diesel fuel to be delivered and, moreover, had accurately reported the levels in the tanks.

Although these subsidiary findings are unassailable on appeal, they do not dispose of the question whether Packer had a reasonable basis for asserting that Dockside was liable for purposes of awarding attorney's fees under § 4A(f)(2).[16] That question turns on whether Packer had a reasonable basis for asserting that Dockside fell within one of the five broadly-defined categories of persons who may be liable, under § 5(a)(1)-(5), "without regard to fault" or causation. G. L. c. 21E, § 5(a), inserted by St. 1983, c. 7, § 5. If, as Packer alleged, Dockside was strictly liable under § 5(a)(1) as an "operator of . . . a site from . . . which there . . . has been a release . . . of oil," Packer would have had a reasonable basis for asserting Dockside's liability.

Whether a person is an "operator" for purposes of the Act depends on whether the person (here, Dockside) had "actual control of, and active involvement in, operations at the site.

---

[16] What "ultimate legal determination" the facts support is a legal question we review de novo. Matter of Jane A., 36 Mass. App. Ct. 236, 239 (1994). See Simon v. Weymouth Agric. & Industrial Soc., 389 Mass. 146, 148-149 (1983); VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 617 n.8 (1994) ("appellate court may reach its own ultimate conclusions based on a trial judge's findings [of fact] and may set aside a trial judge's ultimate ruling that is inconsistent with the [trial] judge's own subsidiary factual findings").

This is a fact-specific determination, and the appropriate factors to consider will differ according to the nature of the enterprise and the relation between the parties involved." Martignetti v. Haigh-Farr, Inc., 425 Mass. at 304. The judge's conclusion that Dockside was not an "operator" of the site rested on the following subsidiary findings. The judge found that Dockside did not own or control the tanks or the land in which they sat. Nor did it have any duty to maintain the tanks. The judge found that Dockside had no role in the day-to-day operations of the site, and no landlord-tenant relationship existed between it and Marmik. Dockside received no rents or profits from the premises and was not involved in a joint venture with Marmik. On the other hand, several of the judge's subsidiary findings point the other way. Dockside had a long-standing arrangement (begun with Packer, and continued with Marmik) whereby it pumped fuel from the tanks for sale to its customers. Fuel was delivered to, and stored at, the tanks at Dockside's instruction and for its use. Dockside's use of the tanks was not casual or intermittent; it was pursuant to a formalized business arrangement whereby it paid a fee to Marmik in exchange for the use of the tanks. In addition, after investigation, DEP notified Dockside that it (DEP) had reason to believe Dockside was potentially liable under the Act. This fact, taken together with those just recited, was certainly a

strong buttress for Packer's position that Dockside bore potential liability as an operator of the site.

We need not, however, decide whether Packer had no reasonable basis for asserting that Dockside was liable as an operator such that an award of attorney's fees and costs was proper under § 4A(f)(2).  The award was independently proper under § 4A(f)(3) given the judge's other findings.  The judge stated that "Packer's insistence that Dockside contribute eighty percent of the clean up costs . . . when Packer well knew that Dockside was blameless in this instance" was alarming. Particularly when that demand is considered with the similar one made to Marmik (together significantly exceeding the actual cost of remediation), and Packer's inflexibility despite its own responsibility for the spill, we have no difficulty concluding that Packer's "position with respect to the amount of the defendant's liability . . . was unreasonable" such that attorney's fees and costs could be awarded under § 4A(f)(3).

Although in other circumstances we might not determine the reasonableness of a presuit litigation position for the first time on appeal, we do so here for several reasons.  First, the issue was raised and fully briefed below.  Dockside's counterclaim sought attorney's fees and costs under all three subsections of § 4A(f), and its application for attorney's fees also pressed all three grounds.  Second, on appeal, Dockside

again argues that the award was proper under all three subsections. Tellingly, Packer challenges only the award under § 4A(f)(2); it does not argue that the award could not rest on § 4A(f)(3). Finally, it is clear that the judge would have made the award under § 4A(f)(3) as well as (or in lieu of) § 4A(f)(2) had he considered the question. As the judge noted, had he "reached the question of equitable apportionment of the [response] costs vis-a-vis Dockside, a finding of zero share would have been entered." It is but a short step from this statement, considered together with the judge's subsidiary findings concerning Dockside's lack of responsibility for the spill and his forceful remarks concerning his "alarm[]" at Parker's intransigent demand for an eighty percent contribution to conclude that the judge would have found Packer's inflexible contribution position unreasonable.

The judgment dated September 3, 2013, and the order dated April 9, 2014, awarding attorney's fees and costs to Dockside are affirmed under G. L. c. 21E, § 4A(f)(3).

So ordered.